STATE v. LEN GAUSE, ALIAS LYNN GAUSE, ALIAS "SCOOPER" GAUSE, ALIAS LEON GAUSE.

(Filed 11 December, 1946.)

**1. Homicide § 27h—**

Where all the evidence tends to show murder perpetrated by lying in wait, the court properly limits the jury to a verdict of guilty of murder in the first degree or a verdict of not guilty, G. S., 14-17, but where the evidence tending to show that defendant intentionally killed deceased with a deadly weapon is susceptible to more than one inference as to whether defendant was lying in wait, it is error for the court to fail to submit the question of defendant's guilt of murder in the second degree. G. S., 15-172.

**2. Criminal Law §§ 53k, 78e (2)—**

The requirement that a misstatement of the contentions must be brought to the trial court's attention in apt time does not apply to a statement of the contentions of the State which erroneously defines the intensity of proof resting upon it as the greater weight of the evidence rather than beyond a reasonable doubt.

**3. Criminal Law § 77d—**

The Supreme Court is bound by the record.

APPEAL by defendant from *Parker, J.,* at June Term, 1946, of NEW HANOVER.

Criminal prosecution instituted in the County of Brunswick, State of North Carolina, upon indictment charging defendant with the murder of one H. J. Williamson,—and upon motion of defendant removed to the County of New Hanover for trial.

The evidence offered upon the trial in Superior Court, as shown in the case on appeal and necessary to a proper understanding of the questions considered in disposing of this appeal, tends to show this pertinent factual situation: H. J. Williamson, a white man, died from gunshot wounds received on Saturday night, 23 February, 1946. At that time he resided in the Gause Landing community, southwest of the town of Shallotte, on the public road leading in general northeast to southwest direction, from that town to Gause Landing, in Brunswick County, North Carolina. The front steps of the house were seven yards from the edge of the road. Defendant, nicknamed Scooper, then resided west of and about three-quarters of a mile from the Williamson home. Between these two houses, Will Hill resided about one hundred yards from the Williamson home. · Joe Gause, a brother of defendant, resided beyond the home of defendant, something like a mile and a quarter from the Williamson home. In going from and to his home and to and from Shallotte, defendant would pass the Williamson home along the public road.

On the late afternoon of the above date, before dark, defendant and another colored man, named Luke Gause (of no kin to defendant), who lived between the Williamson home and Shallotte, were traveling along the public road going in the direction of defendant's home and passing the Williamson home. Defendant was cursing, for which Williamson, who was in front of his home, upbraided him. An altercation between the two ensued. Williamson, a very strong and robust man, weighing 235 pounds and much larger than defendant, knocked defendant down with his fist. Defendant came up with a knife. Whereupon, Williamson got his gun from his front porch (having just put it there after shooting rabbits) and shot at defendant two or three times, running him off down the road toward the Will Hill house, where he stopped. He said he was shot. He tried in vain to buy a gun from Will Hill. Then he went on in direction of his own home.

About an hour later, around 8 o'clock, and after dark, H. J. Williamson was shot while sitting in the front or sitting room of his home, next to the window in the west end of the house. The shot was from without the house, and through the window.

Will Hill, as witness for the State, testified: That he heard one shot after dark; that before that he heard "someone passing talking . . . more like men than women"; that they went right up the road . . . toward Shallotte; that after they passed, he heard a gun fire—and that "it might have been fifteen minutes, something like that."

Luke Gause, also witness for the State, testified: That after Mr. Williamson shot "behind Scooper," Ches Gause and Mosser Hill, colored men, came over to Mr. Williamson's and they and he (Luke) stayed there about fifteen minutes; that they then went, in the direction of

defendant's home, to George Bland's; that, after staying there about 25 or 30 minutes, he and Ches came back up the road,—Ches turning off to go to his home before they reached Mr. Williamson's house; that it was dark then, and a gun fired when he passed Mr. Williamson's; that he "didn't see anybody with any gun, just heard it fire"; and that he was about 75 yards away, and went "in the opposite direction."

Joe Gause, also a witness for the State, testified: That defendant, his brother, came to his house around 8 or 8:30 on night of 23 February, 1946; that he had a 12-gauge gun which he left there; that "he was all wet up and muddy"; that "his hands were bleeding, blood dripping off his fingers"; that he said Mr. Williamson had shot him three times; that "I understood him to say he had shot him back"; that defendant wanted to be carried to his mother's, to get her to do something for the wounded place where he was shot; and that on the way a car came up behind the truck and defendant jumped out and ran.

Defendant surrendered the following Wednesday.

An alleged confession of defendant was offered in evidence in which a statement in part as follows is attributed to him: "that . . . Mr. Jim shot him and hit him in the hand and he started running and . . . he shot him in the other hand"; that "he went on home and got a 12-gauge shotgun and picked up two shells . . . and started back to shoot Mr. Jim, as Mr. Jim had shot him; that he met up with Luther Gause and Charles Gause and they walked down the road with him until they got opposite Charles Gause's home and Charles said he would go on home, and went on home, but that Luther Gause proceeded down the road with him and that Luther walked on when he got to Mr. Williamson's, and that he looked through the window and saw Mr. Williamson sitting in the room; that the curtain was half down; that he . . . knew it was him and aimed at him along about the shoulder and shot him . . . but that he turned and ran . . . and went to his father-in-law's house where his wife was and told them that he had shot Mr. Williamson because Mr. Williamson had shot him; that he went to his brother Joe Gause's and told Joe he had shot Mr. Jim, and left his gun at Joe's . . ."

There was other evidence tending to show that there were eleven perforations in the skin across the upper arm and chest (in diameter about three inches) of the body of H. J. Williamson; that there were 11 or 12 holes in the window and screen; and that a wadding (indicating buck shot) fired from a 12-gauge gun, was found in the yard about twenty feet from the end of the house.

Further evidence was offered by the State tending to show the sanity of defendant, and by the defendant tending to show that he was not sane,—one doctor being of opinion that he is an imbecile.

Verdict: Guilty of murder in the first degree as charged in the bill of indictment.

Judgment: Death by the administration of lethal gas as provided by law.

Defendant appeals to Supreme Court and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Joseph W. Ruark and Varser, McIntyre & Henry for defendant, appellant.*

WINBORNE, J.   Defendant assigns as error, among others, these portions of the charge of the court to the jury:

"You may, as you find the facts to be from the evidence under the instruction of law of the court, return one of two verdicts; either guilty of murder in the first degree, or not guilty."   Exception No. 26.

"The court instructs you that there is no evidence in this case of murder in the second degree or manslaughter.   It is the law of this State that a murder which shall be perpetrated by means of lying in wait shall be deemed to be murder in the first degree."   Exception No. 27.

"Lying in wait is being in ambush for the purpose of murdering another.   It implies a hiding or secreting of one's self.   To constitute lying in wait within the meaning of the statute law, which the court has read to you, providing that all murder perpetrated by means of lying in wait shall be murder in the first degree, three things must concur, to wit, waiting, watching and secrecy."   Exception No. 28.

"The State of North Carolina contends that you should find and be satisfied beyond a reasonable doubt from the evidence in this case that on 23 February, this year, in Brunswick County, the defendant Gause as a result of what took place between him and H. J. Williamson, in front of Williamson's house in the afternoon, and of Williamson striking him and practically knocking him down, and of Williamson shooting him and wounding him in the hands, went and procured a 12-gauge shotgun and procured a shell in order to shoot H. J. Williamson; that he had sufficient intelligence to procure the shotgun and to procure a shell and to put this shell in the shotgun and about an hour after he and Williamson had been in front of Williamson's home to go to the home of Williamson; that he looked through the window and saw Mr. Williamson and had enough intelligence to know that it was Mr. Williamson, and that standing out on the ground, looking through the window there at Williamson, recognized Williamson; that the defendant was there in ambush for the purpose of murdering H. J. Williamson; that he was waiting, watching and in secrecy; that he deliberately aimed at him, and while lying in wait under those circumstances willfully and intentionally shot H. J. Williamson, killing him with the shotgun wounds, and that

he is guilty of murder in the first degree, and that you should be so satisfied by the greater weight from the evidence in the case, and return as your verdict guilty of murder in the first degree." Exception No. 30.

In connection with the above instructions, defendant contends that the court erred (1) in restricting the jury to the return of one of two verdicts,—guilty of murder in the first degree, or not guilty, without including a third,—guilty of murder in the second degree, and (2) in stating the contention of the State with respect to the burden of proof.

It is the law in this State that where all the evidence on the trial for murder tends to show murder in the first degree in that a murder has been perpetrated by lying in wait, G. S., 14-17, the trial court may instruct the jury to render only one of two verdicts, guilty of murder in the first degree or not guilty. *S. v. Newsome,* 195 N. C., 552, 143 S. E., 187; *S. v. Myers,* 202 N. C., 351, 162 S. E., 764. But where on such trial the evidence tends to show that the intentional killing was with a deadly weapon, and more than one inference may be drawn from the evidence in respect to lying in wait, it is error for the trial court to fail to charge the jury that a verdict of murder in the second degree may be returned. G. S., 15-172. *S. v. Newsome, supra. S. v. Merrick,* 171 N. C., 788, 88 S. E., 501; *S. v. Lee,* 206 N. C., 472, 174 S. E., 288.

Applying the definition of lying in wait as given by the court to the evidence offered on the trial below, we are of opinion that more than one reasonable inference may be drawn therefrom, and that there is error in the failure of the court to include murder in the second degree in the verdicts the jury might return in the case.

Moreover, the rule of law as to the degree of proof set forth in stating the contentions of the State as shown in the portion of the charge to which Exception No. 30 relates, is manifestly erroneous. Ordinarily a misstatement of contentions must be called to the attention of the court at the time, or else it will be deemed to be waived. But not so as to statements of a contention with respect to applicable law. *McGill v. Lumberton,* 215 N. C., 752, 3 S. E. (2d), 324, and cases cited. *S. v. Calcutt,* 219 N. C., 545, 15 S. E. (2d), 9; *Stanley v. Hyman-Michaels Co.,* 222 N. C., 257, 22 S. E. (2d), 570.

Doubtless the use of the words "greater weight of evidence" instead of "beyond reasonable doubt" was a slip of the tongue or an error in transcribing. Nevertheless, it appears in the record, and we must accept it as it comes to us.

As the case goes back for a new trial, it is not amiss to say that should the jury find from the evidence beyond a reasonable doubt that the defendant killed the deceased with a deadly weapon, but failed to find from the evidence beyond a reasonable doubt that he killed the deceased while lying in wait, the law would presume no more than murder in the

second degree, and the burden would be upon the State to show pre-meditation and deliberation to make out the capital offense.

For reasons stated, let there be a

New trial.