STATE OF NORTH CAROLINA v. LAWRENCE GRAHAM LEROUX

No. 93A88

(Filed 5 April 1990)

**1. Homicide § 21.6 (NCI3d) — first degree murder — lying in wait — sufficiency of evidence**

The prosecution presented substantial evidence of every element of murder by lying in wait where defendant, by his own admission, was sneaking around a dark golf course and, with a suddenness which deprived the victim of all opportunity to defend himself, fired upon and killed the victim. It was not necessary to show that defendant had an announced purpose or intent to kill the victim when he shot him under those circumstances; furthermore, a specific intent to kill is not an element of the crime and evidence of intoxication is irrelevant as a defense.

**Am Jur 2d, Homicide §§ 44, 47, 49.**

**2. Homicide § 30.1 (NCI3d) — first degree murder — lying in wait — refusal to instruct on second degree murder**

The trial court acted correctly both in instructing the jury on first degree murder perpetrated by lying in wait and in refusing to instruct on second degree murder where nothing in the evidence supports a finding that the murder was committed other than by lying in wait. When the evidence supports a finding that the murder was perpetrated by means of lying in wait and there is no conflict in the evidence, the trial court is not required to instruct the jury on second degree murder, and the trial court may not give an instruction on second degree murder when the State's evidence supports a jury finding of each element of lying in wait and when there is no conflict with respect to such evidence.

**Am Jur 2d, Homicide § 534.**

**3. Homicide § 8.1 (NCI3d) — murder by lying in wait — defense of intoxication — testimony of prior offenses with same defense**

In a prosecution for first degree murder by lying in wait in which defendant attempted to establish that he lacked the capacity to know what he was doing on the night in question because of an alcoholic blackout, the trial court did not err

STATE v. LEROUX

[326 N.C. 368 (1990)]

by allowing testimony on rebuttal regarding a breaking or entering committed two years prior to this offense in which defendant claimed an allegedly similar alcoholic blackout. Although evidence tending to indicate that defendant was cognizant of what he was doing is prejudicial to defendant's specific example of his blackout theory, this evidence is highly probative as well and does not have an undue tendency to suggest decision on an improper basis; the probative value of the evidence is thus not substantially outweighed by the degree of unfair prejudice. N.C.G.S. § 8C-1, Rule 401.

**Am Jur 2d, Homicide §§ 127, 310.**

4. **Criminal Law § 86.5 (NCI3d) — first degree murder by lying in wait — defense of intoxication — cross-examination concerning prior acts**

There was no plain error in a prosecution for first degree murder by lying in wait by allowing the prosecutor's cross-examination of defendant regarding numerous prior acts where the State sought to demonstrate that defendant's assertions of lack of intent due to alcoholism were untruthful. The inquiries into prior instances of misconduct were a proper attempt to explore, explain, or rebut defendant's principal evidence; they constituted proper impeachment in that they detailed matters testified to on direct examination and specifically bore upon defendant's propensity for truthfulness.

**Am Jur 2d, Homicide §§ 127, 328, 540.**

5. **Jury § 6.1 (NCI3d) — first degree murder by lying in wait — defense of intoxication — voir dire questions concerning alcohol — not allowed**

The trial court did not abuse its discretion during jury selection in a prosecution for first degree murder by lying in wait in which defendant alleged lack of intent due to alcoholism by barring defense counsel's questioning of prospective jurors regarding their opinions about alcohol consumption and its effects on mental processes. Counsel is not permitted to fish for legal conclusions or argue its case during voir dire; moreover, defendant obtained the information he sought through voir dire inquiries which were initially permitted and, by doing so, obtained adequate assurances that potential jurors could be fair.

**Am Jur 2d, Jury §§ 202, 204.**

**6. Homicide § 15 (NCI3d) — first degree murder by lying in wait — defense of intoxication — defendant's questions concerning condition of officer**

The trial court did not err in a prosecution for murder by lying in wait in which defendant alleged lack of intent due to alcoholism by permitting the prosecutor to elicit testimony that defendant had not been told that a police officer had been shot prior to defendant's questions about the officer's condition. The testimony was not hearsay because it was adduced for the purpose of showing that defendant was not told that anyone had been shot and the truth of the assertion depended only on the credibility of the testifying witness; the testimony was relevant to show defendant's firsthand knowledge of the fact that an officer had been shot and was admissible to impeach defendant's credibility; and the information was subsequently admitted without objection through the testimony of another officer.

**Am Jur 2d, Homicide §§ 127, 328.**

**7. Criminal Law § 1226 (NCI4th) — murder — alcoholism — mitigating factor not found**

The trial court did not err in a prosecution for first degree murder by lying in wait by failing to find the statutory mitigating factor that defendant was suffering from a physical condition which was insufficient to constitute a defense but which significantly reduced his culpability. Defendant did not request this factor and did not object to the court's failure to find the factor, and the evidence of defendant's intoxication at the time of the offenses was controverted and failed to meet the required standard. N.C.G.S. § 15A-1340.4(a)(2)d (1983).

**Am Jur 2d, Criminal Law §§ 527, 598, 599, 628.**

DEFENDANT appeals as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment in a capital proceeding imposing a sentence of life imprisonment entered by *Burroughs, J.,* at the 2 November 1987 Criminal Session of Superior Court, MECKLENBURG County, upon a jury verdict of guilty of first-degree murder perpetrated by lying in wait. Defendant was additionally found guilty of five counts of discharging a firearm into an occupied dwelling in violation of N.C.G.S. § 14-34.1, for which he was sentenced to five consecutive ten-year sentences, and two counts of assault on a law

enforcement officer with a deadly weapon, a felony under N.C.G.S. § 14-34.2, for which he was sentenced to two consecutive five-year sentences. Defendant's motion to bypass the Court of Appeals on these convictions was allowed 12 July 1989. Heard in the Supreme Court 12 December 1989.

*Lacy H. Thornburg, Attorney General, by David F. Hoke, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant assigns error to five aspects of the guilt-innocence phase of his trial and to one aspect of the sentencing proceeding. We have performed a careful and thorough review of the record, the briefs, and oral arguments of counsel, and we conclude that defendant received a fair trial free of prejudicial error.

The State's evidence tended to show that defendant engaged in a shooting spree in the early morning hours of 15 January 1987 in his Charlotte neighborhood. With his .22 rifle, he ·shot into the windows of several residences over a time period from approximately 12:00 midnight on 14 January to 2:00 a.m. on 15 January. Several residents testified that they heard rapid gunfire, as much as thirty or forty gunshots, on as many as five or six occasions that night. One of the residents called the Charlotte Police Department around 1:15 a.m., and Officers R.J. Hammett and R.L. Smith arrived on the scene a few minutes later. The resident related the circumstances of the shooting to them, and the officers then proceeded to walk across the fairway of the adjacent golf course in search of the perpetrator. There was a full moon that night, but a meteorologist testified as an expert witness for the defense that during the time period in question, clouds created a "total opague [sic] sky cover." This condition meant that the "cloud cover was so totally covering the sky and was of such thickness that there would be no discernable light from the moon."

Officer Hammett testified that he and Officer Smith proceeded to walk across the fairway, which was approximately two hundred feet wide, with Smith leading the way. Smith used his flashlight; Hammett did not. When they reached the tree line on the far side of the fairway, they turned to the right to walk down the

STATE v. LEROUX

[326 N.C. 368 (1990)]

fairway toward the green. The officers had walked about forty or fifty feet when Smith exclaimed, "What's that? Look at that. Hit the deck." Shots then rang out from the darkness ahead of them. Hammett dropped to the ground and called for Smith, but received no response. After he sent a radio message to the police station for assistance, he spotted a man who was dressed in dark clothes in front of him. The man got up from a crouched position and began running along the tree line of the fairway into the woods. Hammett shot at the man and took cover behind a tree. He could hear the man running on the dead leaves through the woods. It sounded as if the man was running in a semicircle around toward him. Hammett moved around the tree in an attempt to protect himself. Officers S.P. Maxfield and Jerry Williams arrived a few minutes later. As they approached his side of the fairway, Hammett heard several shots and heard the suspect yell. He called for him to drop the gun, but the suspect continued to run. The suspect yelled again, and another volley of shots was fired. The chase continued for several minutes. Hammett then heard a shotgun blast and heard Williams yell, "he's down." Hammett walked to where Williams was standing and observed a man on the ground with a rifle beside him. He identified that man as the defendant.

Officer Williams testified that when he arrived, he armed himself with a shotgun and proceeded toward Officer Smith's body. After ascertaining that Smith was dead, he assisted his fellow officers in attempting to apprehend the suspect. He testified that after some time, he saw the suspect come out from behind a condominium. Williams aimed his shotgun at the suspect and ordered him to drop his gun. When the suspect instead raised his weapon, Williams shot him in the upper arm. Williams then approached the suspect, who said, "Well, you guys win." Williams testified that the suspect seemed to be very much in control of his mental and physical faculties and that he never saw any sign of faulty steps or staggering. The suspect was taken to the hospital for medical attention. The officer who rode in the ambulance with the suspect testified that he did not detect any odor of alcohol on the suspect and that he spoke normally. The operating physician testified, however, that he smelled alcohol on the suspect, tested him, and discovered that he had a blood alcohol content of .166.

Sergeant Rick Sanders of the homicide investigation unit of the Charlotte Police Department interviewed the suspect in the emergency room. The interview was tape recorded. The suspect

stated that he had been drinking in several nightclubs that night. He did not remember arriving home. He recalled hearing a "lot of yelling and screaming, and whatever, on the golf course. . . . And I saw some flashlights and I heard some noises. The last thing I remember is a big bang—that's all I can remember." He then stated that everything got "real still and real quiet. So I went downstairs and I got the rifle and I went outside anyway and snuck around. . . . And I guess I really shouldn't have gone down there, but I did. . . . I can't deny that I wasn't sneaking around, and I was. I was going between trees and going between shrubs and stuff, and sneaking around[,] . . . weaving in and out, staying low to the ground." He recalled that he had the rifle with him and "[i]t was loaded and cocked too. And . . . I got up to the next apartment complex down there, . . . and I started going up over the hill, and the next thing I know it was just a big crash and my hands were burning, and I just fell down." The suspect did not recall shooting his gun that night and did not recall seeing a police officer until he himself had been shot.

Officer T. L. Athey of the Charlotte Police Department testified that he rode with defendant in the ambulance en route to the hospital. Defendant inquired, "Did I shoot anybody[?]" Athey answered affirmatively. At the hospital, defendant asked if any policemen were shot. Athey informed him that one had been shot, and defendant asked how he was.

During the taped interview with Officer Sanders, defendant remembered talking to Athey earlier and asking him how the policeman was who had been shot. Sanders stated that when defendant had inquired earlier as to the condition of the policeman who was shot, nobody had informed him that anybody had in fact been shot.

An owner of a nearby pawn shop testified that defendant pawned the rifle in question, a .22 semiautomatic, on 10 January 1987 and reclaimed it on 14 January, the day before the shootings. After the incident, police detectives combed the area for residual shells and bullets. A ballistics expert testified that, in his opinion, the two projectiles found in Officer Smith's body—one in his neck and one in his right thigh—were fired from defendant's rifle. Two additional bullets were imbedded in Officer Smith's protective vest. The other bullets found in and around the condominiums fired into that night were consistent with the projectiles fired from defendant's rifle.

STATE v. LEROUX

[326 N.C. 368 (1990)]

Defendant testified in his own behalf. He relied on an intoxication defense, basing his case on the theory that he was incapable of forming the intent to shoot Officer Smith that night and therefore was not guilty of first-degree murder. He testified that his drinking had caused problems during his service in the Navy and that as a result he had received in-patient treatment for twenty-eight days for his alcohol problem. He testified that he had experienced alcoholic blackouts on numerous occasions and that he had once been charged with breaking and entering the mobile home next to the one in which he lived because, in his intoxicated state, he thought that the mobile home was his own. That charge was dismissed because of defendant's alcohol problem, and his attorney recommended that he seek treatment.

Dr. John Ewing, a psychiatrist specializing in alcoholism, testified that defendant suffered from "chronic alcoholism" and that, in his opinion, it was likely that he had a blood alcohol content of at least .20 at the time of the shootings. He explained that when a person has a blood alcohol content above .12 or .14, it begins to interfere with his protein synthesis, and his memory cannot be transferred from short-term to long-term. He explained, however, that such a blackout does not preclude a person from taking routine actions and that defendant could have fired his rifle despite being in the midst of an alcoholic blackout. He opined that defendant would not have been able, however, to formulate a goal and then act on it and thus could not have been able either to exercise judgment or to form the intent to harm anyone.

[1] Defendant first assigns error to the trial court's charge to the jury. The court submitted a charge of first-degree murder solely under the theory of lying in wait. The jury was instructed that it was to find defendant either guilty of first-degree murder or not guilty. Defendant initially asserts that the State's evidence was insufficient to prove beyond a reasonable doubt defendant's guilt as to each element of the offense. He alternatively contends that the evidence supporting this theory was inconclusive and therefore supported an instruction on second-degree murder.

Defendant asserts that the trial court erred in denying his motion to dismiss the charge of first-degree murder because the State's evidence was insufficient to convince a rational trier of fact beyond a reasonable doubt that defendant killed Officer Smith "by placing himself in a position along the golf course fairway

in order to make a secret ambush" on him. Defendant argues that this case lacks the common thread found among the lying-in-wait cases in the past: that the defendant stationed himself in a position of attack knowing the specific victim would pass and waiting for the victim with the intent to kill him. Defendant contends the assailant's purpose must be evident or announced before the killing in order to show the offense of lying in wait, relying on *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), for this contention. Defendant contends that, not only did he fail to manifest an intention to kill Smith, but also he did not station himself in a position of ambush because he never concealed his presence and because the victim, Officer Smith, knew defendant was armed and in the area.

The State counters that the record indicates that the prosecution presented substantial evidence concerning every element of the crime charged. We agree. Upon defendant's motion to dismiss, all of the evidence must be considered in the light most favorable to the State, and the State is entitled to every inference of fact which may be reasonably deduced from the evidence. S*tate v. Witherspoon*, 293 N.C. 321, 237 S.E.2d 822 (1977). The trial court must determine whether there is sufficient evidence that the offense was committed in a fashion consistent with the prosecution's theory of the case. *State v. Chapman*, 293 N.C. 585, 238 S.E.2d 784 (1977). We conclude from our review of the evidence that lying in wait can certainly be inferred from the facts of this case.

A murder perpetrated by means of lying in wait is murder in the first degree. *Brown*, 320 N.C. 179, 358 S.E.2d 1. Premeditation and deliberation are not elements of the crime of first-degree murder perpetrated by means of lying in wait, nor is a specific intent to kill. The presence or absence of these elements is irrelevant. *State v. Evangelista*, 319 N.C. 152, 353 S.E.2d 375 (1987). Murder perpetrated by lying in wait "refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim." *State v. Allison*, 298 N.C. 135, 147, 257 S.E.2d 417, 425 (1979). The assassin need not be concealed, nor need the victim be unaware of his presence. "If one places himself in. a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait." *Id.* at 148, 257 S.E.2d at 425.

The State need not prove that the killer stationed himself and waited at the site of the killing for some period of time before it may proceed on a theory of lying in wait. "Even a moment's deliberate pause before killing one unaware of the impending assault and consequently 'without opportunity to defend himself' satisfies the definition of murder perpetrated by lying in wait." *Brown*, 320 N.C. at 190, 358 S.E.2d at 10 (quoting *State v. Wiseman*, 178 N.C. 784, 790, 101 S.E. 629, 631 (1919)) (citation omitted). In *State v. Bridges*, 178 N.C. 733, 101 S.E. 29 (1919), police officers went to the defendants' home for the purpose of arresting them. They did not know whether anyone was in the house, but upon turning a corner inside the house, an officer was suddenly fired upon by the defendants. The victim "had no time even to raise his pistol' in defense of himself. The defendants were waiting in the dark for him, as much concealed as if they had been hidden in ambush, prepared to slay without a moment's warning to their victim." *Id.* at 738, 101 S.E. at 32.

In the case *sub judice*, Officer Hammett was on the fairway of the dark golf course when Officer Smith said, "What's that? Look at that. Hit the deck. Hit the ground." A volley of shots immediately rang out. Hammett signaled for help on his hand radio. He then observed "a figure start to get up, like from a crouch, and . . . running parallel to me but into the woods." It sounded as though the runner, who was dressed in dark clothing, "was coming in a semicircle around towards me." As the other two officers arrived to assist in the assailant's capture, another volley of shots, which seemed to be coming "from further up the fairway and on the other side of the fairway," rang out. Defendant himself admitted to "sneaking around" on the golf course, "going between trees and going between shrubs," and "staying low to the ground" with his loaded and cocked rifle. This Court has defined the concept of lying in wait as follows:

> "If [the assailant] placed himself in a position so as to make a private attack upon his victim, so as to assail him, under circumstances when the person assailed did not know of his presence, or of his purpose, and in the darkness of the night, or when the ordinary darkness was obscured by clouds and mist, and under such circumstances when he makes a secret assault upon the person assailed and shoots and kills him, and flees without a disclosure of his identity — a killing under

STATE v. LEROUX

[326 N.C. 368 (1990)]

these circumstances would constitute a waylaying within the meaning of the statute."

*State v. Wiseman,* 178 N.C. 784, 789-90, 101 S.E. 629, 631 (quoting trial judge's charge and approving it as being in accord with existing authority).

The circumstances of this case fall within the above definition. Defendant, by his own admission, was sneaking around the dark golf course and, with a suddenness which deprived Officer Smith of all opportunity to defend himself, fired upon and killed the officer. It was not necessary for the State to show that defendant had an announced purpose or intent to kill Officer Smith when he shot him under those circumstances. As this Court has established, "a specific intent to kill is . . . irrelevant when the homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture." *State v. Johnson,* 317 N.C. 193, 203, 344 S.E.2d 775, 781; *see also State v. Evangelista,* 319 N.C. 152, 158, 353 S.E.2d 375, 380. When we take the evidence in the light most favorable to the State and draw from it every reasonable inference which can be drawn, the evidence was sufficient to convince a rational jury beyond a reasonable doubt that defendant was guilty of this crime. We therefore conclude that the trial court was correct in denying defendant's motion to dismiss.

Next, defendant contends that the trial court erred in failing to instruct the jury of the need to find that defendant acted with a specific intent to kill Officer Smith. He asserts that although this Court has reasoned that specific intent to kill is not an element of first-degree murder when the perpetrator kills his victim by administering poison, *State v. Johnson,* 317 N.C. 193, 344 S.E.2d 775, this rule does not control a case where the State proceeds on a theory of lying in wait. Defendant asserts, first, that unlike killing with poison, killing by lying in wait does not necessarily raise a compelling inference of an intent to kill anyone. Second, defendant asserts that he offered substantial evidence regarding his alcoholic condition to negate any intent to kill. The defendant urges us to recognize, as an evidentiary conflict, his evidence that he was in a highly intoxicated state and was therefore incapable of forming the intent to kill. However, this Court has established that a specific intent to kill is not an element of the crime of first-degree murder by lying in wait and that evidence of intoxica-

tion is therefore irrelevant as a defense. *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1. We conclude that this argument has no merit.

[2] Defendant further contends that the evidence of lying in wait was in conflict and that the evidence supported submitting to the jury the charge of murder in the second degree. This Court has held that when the evidence allows more than one inference with respect to lying in wait, it is error for the trial court to fail to charge the jury that a verdict of murder in the second degree may be returned. *State v. Gause*, 227 N.C. 26, 40 S.E.2d 463 (1946). In that case, the defendant offered evidence of a confrontation with the victim earlier that day in which the victim shot and beat him. Defendant went home, retrieved his shotgun, and returned to the victim's home for the purpose of shooting him. Upon arriving, defendant looked through the window, spotted the victim, shot him, and ran away. The Court held that the evidence was inconclusive on the theory of lying in wait and that an instruction on second-degree murder should therefore have been given. Defendant here contends that had the jury been instructed on and rejected the element of specific intent to kill, it could have returned a verdict of murder in the second degree.

Defendant's assertion that when the evidence permits more than one inference with respect to lying in wait, the trial court must instruct the jury on second-degree murder is a correct statement of the law. This Court recently held in *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989), that in a felony-murder prosecution under an indictment in the form prescribed by N.C.G.S. § 15-144, evidence that the defendant did not commit the underlying felony requires an instruction upon whatever lesser included homicides the indictment and the evidence support, including second-degree murder. The indictment in this case was in the form prescribed by N.C.G.S. § 15-144. An indictment in such form will support a verdict finding the defendant guilty of first-degree murder upon any of the theories set forth in N.C.G.S. § 14-17 or guilty of any lesser offense included within any of those theories. *State v. Talbert*, 282 N.C. 718, 721, 194 S.E.2d 822, 825 (1973). The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements. *State v. Peacock*, 313 N.C. 554, 330 S.E.2d 190 (1985); *State v. Strickland*,

307 N.C. 274, 298 S.E.2d 645 (1983), *holding modified by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775.

Unlike *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555, here we perceive no such conflict in the evidence as to the crime charged. Nothing in the evidence suggests that defendant committed the crime other than by lying in wait. The State's evidence unequivocally demonstrates that the defendant, under cover of darkness, made a secret assault when he shot and killed Officer Smith, who had no opportunity to defend himself against the unexpected attack. Defendant merely asserts that he does not remember the circumstances surrounding the shooting. When the evidence supports a finding that the murder was perpetrated by means of lying in wait and there is no conflict in the evidence, the trial court is not required to instruct the jury on second-degree murder. *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645. The trial court may not give an instruction on second-degree murder when the State's evidence supports a jury finding of each element of lying in wait and when there is no conflict with respect to such evidence. Nor may a trial court premise a second-degree murder instruction on the possibility that the jury will accept some of the State's evidence while rejecting other portions of the State's case. *State v. Hicks*, 241 N.C. 156, 84 S.E.2d 545 (1954). Here, there was no evidence to negate the elements of murder perpetrated by lying in wait. Defendant does not deny that he was present on the golf course that night, "sneaking around," "going between trees and going between shrubs," and "staying low to the ground" with his loaded and cocked rifle.

In *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, this Court addressed the identical contention that because the evidence of lying in wait was in conflict and because the defendant was intoxicated, a charge of second-degree murder should have been submitted to the jury. This Court first established that neither a specific intent to kill nor premeditation and deliberation constitute elements of the crime of first-degree murder by lying in wait; thus, intoxication is irrelevant. It then concluded that "[j]ust as '[a]ny murder committed by means of poison is automatically first-degree murder[,]' so any murder committed by means of lying in wait is automatically first degree murder." *Id.* at 193, 358 S.E.2d at 12 (quoting *State v. Johnson*, 317 N.C. 193, 204, 344 S.E.2d 775, 782) (citation omitted). We therefore conclude that the trial court acted correctly both

in instructing the jury on first-degree murder perpetrated by lying in wait and in refusing to instruct on murder in the second degree.

[3]    Defendant next assigns error to the trial court's decision to allow testimony on rebuttal regarding a breaking or entering offense committed by defendant two years prior to this incident. Defendant contends that this evidence was irrelevant and its admission unfairly prejudicial.

Defendant's trial strategy consisted of attempting to establish that because of an alcoholic blackout, he lacked the mental capacity to know what he was doing while on the golf course on the night in question. Through the testimony of three witnesses, defendant produced evidence of a prior breaking or entering charge stemming from an allegedly similar alcoholic blackout.

First, William Holtz, a defense attorney, testified that he was appointed to represent defendant on the first-degree burglary case arising from the incident and that defendant told him that he "did not remember much of what occurred" and that "he had been drinking heavily." Holtz contacted the district attorney's office, and as a result of that contact, arrangements were made to dismiss the charge. Holtz recommended to defendant that he obtain treatment for his drinking problem.

Second, defendant testified in his own behalf regarding the incident. His only recollections were of drinking that night and of being arrested.

Third, Dr. John Ewing, a psychiatrist, testified that in his expert opinion defendant, due to his chronic alcoholism, suffered from memory loss on the night at issue and was in an alcoholic blackout. He illustrated this theory by recounting prior occasions on which defendant had ostensibly experienced blackout episodes, including the breaking or entering incident. He theorized that defendant "was sufficiently intoxicated that he could not identify his own trailer" and "presumably was trying to get into his own home."

On rebuttal, the State called the victim of the breaking or entering incident to testify as to her perception of what transpired. She identified defendant as the perpetrator, described how she and her husband armed themselves with knives to pursue him, and described defendant's arrest. She stated that during the incident, defendant "went down on his hands and knees and started

telling me that his wife was pregnant and she had left him and he needed money." This was his stated rationale for breaking into her mobile home.

Defendant asserts that the trial court's only reason for admitting the evidence was for the purpose of showing defendant's intent to commit the present crimes. Defendant contends that the evidence was not probative, however, of defendant's intent or plan because it had no logical tendency to show the specific intent at issue here. He had previously testified that this charge had been dismissed. The testimony therefore bore no relevance to any material issue in this case.

The State contends that the evidence at issue was relevant to rebut defendant's intoxication defense. The trial court's limiting instruction confined the State's evidence, not only to show a similar plan or scheme, but also for the purpose of rebuttal:

> This evidence was received solely for the purpose of showing that there existed in the mind of the defendant a plan, scheme, system, or design involving the crimes charged in these present cases, or it was received for the purpose of rebutting earlier testimony presented on behalf of the defendant. If you believe [the victim's] testimony, you may consider it but only for the limited purposes for which it was received.

Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1983). The State's purpose was to appropriately challenge defendant's blackout defense:

> Discrediting a witness by proving, through other evidence, that the facts were otherwise than as he testified, is an obvious and customary process that needs little comment. If the challenged fact is material, the contradicting evidence is just as much substantive evidence as the testimony under attack, and no special rules are required.

1 Brandis on North Carolina Evidence § 47 (3d ed. 1988). Certainly, defendant's explanation to the victim regarding his reasons for attempting to break into her mobile home would tend to challenge his theory that he did not know what he was doing at the time.

.

Although evidence tending to indicate that defendant was cognizant of what he was doing is prejudicial to defendant's specific example of his blackout theory, this evidence is highly probative as well and does not have an undue tendency to suggest decision on an improper basis. We thus conclude that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. We reject this assignment of error.

[4] Defendant's third assignment of error relates to the prosecution's cross-examination of him concerning numerous prior acts. During this questioning, the prosecutor asked defendant questions covering subjects ranging from defendant's military duty during a period when he was absent from his station without authorization and an occasion when he refused to obey the command of a superior officer, to defendant's various traffic infractions. The prosecutor also questioned defendant regarding his possession of marijuana on three occasions, although defendant was not criminally charged with this possession. Defendant contends that because none of this conduct either resulted in a criminal conviction or was probative of truthfulness or veracity, it was impermissible subject matter for cross-examination. Rule 608(b) of the North Carolina Rules of Evidence strictly limits impeachment by specific instances of conduct. The prior conduct must be probative of veracity, and its probative value must be shown to outweigh the prejudicial effect of the evidence. Here, defendant contends, the questions were irrelevant and were prejudicial because they represented a deliberate, belabored attempt to impugn defendant's character in the eyes of the jury.

The State counters that defendant only objected to one specific question during its line of questioning, an inquiry regarding defendant's absence from his duty station on one occasion. Defendant therefore waived his right to appeal on this ground under N.C.R. App. P. 10(b)(2), and we must discover "plain error" in order to afford defendant relief. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Upon our review of the entire record, we cannot say that the claimed error had a probable impact on the jury's finding of guilt of a nature which would mandate the award of a new trial. *Id.* The inquiries into prior instances of defendant's conduct were a proper attempt to explore, explain, or rebut defendant's proffered evidence. *State v. Brown*, 310 N.C. 563, 313 S.E.2d 585 (1984). They constituted proper impeachment in that they detailed matters testified to on direct examination and specifically bore

upon defendant's propensity for truthfulness. Impeachment by cross-examination may be employed to test a witness' credibility in a number of ways, and the examiner is permitted wide latitude in this endeavor. 1 Brandis on North Carolina Evidence § 42 (3d ed. 1988).

> [T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

State v. Albert, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981).

The State sought to demonstrate through its line of questioning that defendant's assertions of lack of intent due to alcoholism were untruthful. For example, defendant testified on direct examination that he was honorably discharged from the Navy, but admitted on cross-examination that he falsified his enlistment contract. He testified that he underwent in-patient treatment for alcoholism while in the Navy, but admitted that his hospitalization was at least partially precipitated by the fact that he struck a police officer. The State's questioning tests the plausibility of the defense theory that while in the Navy, defendant developed a drinking problem which, over the years, became a chronic disease rendering him nonculpable on the night in question. The State sought to show that defendant's Navy service was in fact replete with instances of bad conduct. We conclude that there was no plain error in the trial court's decision to allow this cross-examination.

[5] Defendant next contends that the trial court erred in barring his counsel's questioning of prospective jurors regarding their opinions about alcohol consumption and its effects on mental processes. Counsel asked such questions as, "Would your theories about the overindulgence of alcohol tend to color your thinking about [defendant] if you find that he is an alcoholic from the evidence?" and "Do you have such strong feelings about the use of alcohol that you couldn't be fair to someone that you believe to be an alcoholic?" The trial court sustained the prosecutor's objections to this line of questioning. Defendant now asserts that the preclusion of this line of inquiry contravened basic principles of jury selection because the restrictions placed upon him during his voir dire examination

precluded him from meaningfully and intelligently exercising his peremptory challenges. We do not agree.

The purposes of *voir dire* are to eliminate extremes of partiality and to assure the parties that the resulting jury will make its decision solely from the evidence presented. *State v. Honeycutt,* 285 N.C. 174, 203 S.E.2d 844 (1974), *judgment vacated on other grounds,* 428 U.S. 903, 49 L. Ed. 2d 1207 (1976). However, counsel is not permitted to "fish" for legal conclusions or argue its case during *voir dire,* and for that reason the trial court properly ended the line of inquiry. *State v. Phillips,* 300 N.C. 678, 268 S.E.2d 452 (1980). While counsel may inquire into a potential juror's fitness to serve, the extent and manner of that inquiry rests within the sound discretion of the trial court. *State v. Parks,* 324 N.C. 94, 376 S.E.2d 4 (1989). Defendant has failed to show that the trial court's action was an abuse of discretion. Nor has he demonstrated prejudice. He obtained the information he sought through the *voir dire* inquiries which were initially permitted and, by doing so, obtained adequate assurances that the potential jurors could be fair. We therefore find no error in this assignment.

**[6]** Defendant's next assignment of error regards the trial court's decision to permit the prosecutor to elicit from investigating police officer Rick Sanders testimony that defendant had not been told a police officer had been shot prior to defendant's questions about the slain officer's condition. Sanders initially testified for the defendant regarding statements defendant made during his interview in the hospital emergency room. Sanders testified that defendant told him he did not remember shooting into any windows or shooting any person. Defendant further stated that he did not remember seeing any police officers until he himself was shot. On cross-examination, the State asked Sanders if defendant had been asked during the interview whether he remembered asking T. L. Athey, the officer traveling in the ambulance with defendant to the hospital, whether a policeman had been shot and, when told that one had been, asking about his condition. Defendant answered that he did remember asking Athey those questions. Sanders then testified, over objection, that up to the point when defendant asked Officer Athey about whether a policeman had been shot, nobody who had contact with defendant had said anything to him about anybody having been shot. Defendant now contends that Sanders' testimony to the effect that no one who had contact with defendant had said anything to him about anybody having been shot constituted

hearsay not falling within any exception because it was offered to prove that defendant was not told about Officer Smith's injury.

The State asserts, and we agree, that Sanders' testimony was not hearsay. Testimony to the effect that nobody in defendant's presence had said anything to him about anybody having been shot does not fall within the definition of hearsay contained in Rule 801 of the North Carolina Rules of Evidence. This testimony was adduced for the purpose of showing that defendant was not told that anyone had been shot. The truth of this assertion depended only on the credibility of Officer Sanders, the testifying witness. Thus, it was not hearsay. The testimony was relevant to show defendant's firsthand knowledge of the fact that an officer had been shot and thus was admissible to impeach defendant's credibility. Defendant's contention was that he had blacked out and did not remember anything until he himself had been shot. This evidence constitutes an inconsistency admissible for the jury's consideration in determining defendant's credibility and, as such, is proper impeachment. *State v. Cope*, 240 N.C. 244, 81 S.E.2d 773 (1954).

We further note that this information was subsequently admitted without objection through the testimony of Officer T. L. Athey. Athey testified that he rode in the ambulance with defendant, that defendant asked, "[D]id I shoot anybody?" and that, upon arrival at the hospital, defendant asked if any policemen were shot. Athey also testified, as did Sanders, that nobody had said anything to defendant about anybody being shot at that point. When evidence is admitted over objection and the same evidence is later admitted without objection, the benefit of the objection is lost. *State v. Searles*, 304 N.C. 149, 282 S.E.2d 430 (1981). We conclude that defendant has failed to show error by this assignment.

[7] Finally, defendant contends that the trial court erred during the sentencing phase in failing to find the statutory mitigating factor that defendant was suffering from a physical condition which was insufficient to constitute a defense, but which significantly reduced his culpability for the offense. N.C.G.S. § 15A-1340.4(a)(2)(d) (1983). Defendant concedes that he did not request this factor, nor did he object to the trial court's failure to find the factor. He contends, however, that if there is evidence of a statutory mitigating factor's existence that is both uncontradicted and manifestly credible, a trial court errs in failing to find that factor, even if not

requested by defendant. Defendant contends that he offered plenary evidence of a physical condition which was insufficient to constitute a defense in the eyes of the jury, but which nevertheless reduced his culpability for the assaultive conduct. He testified that he drank as many as nineteen beers before the shooting. He stated that he had become dependent on alcohol while in the Navy and that he had received treatment for it. The examining physician testified that defendant's blood alcohol content was .166 at the time that defendant arrived at the hospital after the shooting. Defendant's expert witness, Dr. Ewing, testified that defendant's blood alcohol level at the time of the shooting would probably have exceeded .20 and that, in his opinion, defendant suffered from chronic alcoholism. Various witnesses chronicled defendant's history of alcohol abuse.

The burden is on the defendant to prove the existence of a mitigating factor by a preponderance of the evidence, and a court is required to find a statutory mitigating factor only if the evidence supporting it is uncontradicted and manifestly credible as a matter of law. *State v. Jones*, 309 N.C. 214, 306 S.E.2d 451 (1983). It is evident from our review of the entire record in this case that the evidence of defendant's intoxication at the time of the offense is indeed controverted and therefore fails to meet the required standard. "Only if the evidence offered at the sentencing hearing 'so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn' is the court compelled to find that the mitigating factor exists." *State v. Clark*, 314 N.C. 638, 642, 336 S.E.2d 83, 85 (1985) (quoting *State v. Jones*, 309 N.C. 214, 220, 306 S.E.2d 451, 455). The proffered evidence of diminished capacity due to intoxication in this case does not compel this finding because it fails to demonstrate that defendant's alcohol consumption reduced his mental or physical capacity, and thus his culpability, to commit the offense.

Several witnesses presented manifestly credible evidence that defendant appeared to be in total control of his mental and physical faculties on the night in question. Officer Williams testified that from his observations of defendant both before and after defendant was ultimately forced to surrender, defendant appeared to be very much in control of his mental and physical faculties and that he never observed any indication of faulty steps or staggering. The officer who performed the gunpowder residue test on defendant at the emergency room of the hospital testified that defendant

BROWN v. LUMBERMENS MUT. CASUALTY CO.

[326 N.C. 387 (1990)]

was "very cooperative," with no odor of alcohol about him. Officer Sanders testified that he interviewed defendant before his surgery and that defendant was "clear and lucid," even "correcting me on a couple of statements and questions I had asked him." A woman working at one of the bars defendant visited late in the evening before returning home testified that defendant did not in any way appear to be intoxicated to her. While the doctor who performed surgery on defendant testified that he smelled alcohol on the defendant and tested his blood alcohol level at .166, he also stated that defendant was in control of his faculties, that he was alert, intelligently discussed the upcoming surgery, and signed a consent form to undergo anesthesia. Evidence that the condition of intoxication exists, without more, does not mandate its consideration as a mitigating factor. *State v. Bush*, 78 N.C. App. 686, 338 S.E.2d 590 (1986). We find no error in this assignment.

We conclude that defendant received a fair trial free of prejudicial error.

No error.