STATE OF NORTH CAROLINA v. STEPHEN JACKSON FAUCETTE

No. 179A89

(Filed 13 June 1990)

**1. Criminal Law § 73.2 (NCI3d)— statement not hearsay**

　　Testimony by a murder victim's son that the victim said she did not want defendant to come to the house because he had failed to provide support for his child was not hearsay since it was not offered to prove the truth of the matter asserted—that defendant in fact failed to provide child support.

　　**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**2. Criminal Law § 73.3 (NCI3d)— state of mind exception to hearsay rule—admissibility of statements**

　　Hearsay statements made by a murder victim to her son and her sister indicating that defendant had threatened her

were admissible in a murder and burglary trial pursuant to N.C.G.S. § 8C-1, Rule 803(3) to show the victim's state of mind in order to explain why the victim would not allow defendant to visit her home, to prove that defendant entered the victim's home without consent, and to rebut defendant's testimony as it pertained to inferences of self-defense. Furthermore, the prejudicial effect of these statements did not outweigh their probative value in violation of Rule 403.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**3. Criminal Law § 612 (NCI4th) — reliability of hearsay evidence**

Testimony by a murder and burglary victim's son about statements made by the victim that defendant had threatened her was not so unreliable as to be inadmissible on constitutional grounds where the testimony was admissible under the state of mind exception to the hearsay rule, it was corroborated by another witness, and the fact that defendant broke and entered the victim's home before shooting her lends credence to her statements.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**4. Criminal Law § 73.2 (NCI3d) — catchall exception to hearsay rule — materiality of testimony**

An attorney's hearsay testimony as to statements made to him by a burglary and murder victim concerning domestic difficulties between the victim and defendant and defendant's failure to support his child was material within the meaning of the Rule 804(b)(5) catchall exception to the hearsay rule because it was relevant to rebut defendant's testimony that he went to the victim's home with the intent to talk to the victim and see his child and not to commit murder, and it was relevant to establish ill will between defendant and the victim from which the jury could infer premeditation and deliberation.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**5. Criminal Law § 73.2 (NCI3d) — hearsay statements by murder victim — most probative evidence available**

The record supports the trial court's conclusion that hearsay statements made by a murder victim to her attorney were the most probative evidence of any available to the State

STATE v. FAUCETTE

[326 N.C. 676 (1990)]

regarding the domestic problems existing between the victim and defendant.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**6. Criminal Law § 73.2 (NCI3d) — State's use of hearsay statements — adequate notice**

Fifteen days was adequate notice of the State's intent to use hearsay statements made by a murder victim to her attorney where defendant himself was the best source for information about these statements and no alternate investigation was likely to provide further information.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**7. Criminal Law § 73.2 (NCI3d) — hearsay statements to attorney — guarantee of trustworthiness**

The attorney-client relationship was a sufficient guarantee of trustworthiness to admit a murder victim's hearsay statements to her attorney concerning her domestic problems with defendant since the statements concerned matters within her personal knowledge, and she had a motivation to speak truthfully with her attorney.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**8. Criminal Law § 73.2 (NCI3d) — catchall hearsay exception — statements not otherwise admissible — absence of finding — harmless error**

The trial court erred in ruling that a murder victim's statements to her attorney were admissible under the Rule 804(b)(5) catchall exception to the hearsay rule without finding that the statements were not otherwise admissible. However, admission of the hearsay statements was not prejudicial error in light of the overwhelming evidence of defendant's guilt and other similar evidence before the jury.

**Am Jur 2d, Evidence §§ 496, 497; Homicide §§ 329, 330.**

**9. Criminal Law § 85.2 (NCI3d) — cross-examination of character witness — knowledge of crime by defendant — harmless error**

Defendant was not prejudiced by any error in the State's cross-examination of defendant's character witness about his knowledge that defendant had previously broken into a murder victim's house to rebut testimony by the witness that defend-

ant was a gentle and nonviolent person where evidence that the victim had charged defendant with breaking and entering was already before the jury.

**Am Jur 2d, Evidence § 345.**

**10. Criminal Law § 695 (NCI4th) — indictments not read to jurors**

The trial judge did not read the bills of indictment to the jury in violation of N.C.G.S. §§ 15A-1213 and 15A-1221(b) where he drew from each indictment the case number, defendant's name, and the victim's name and set out the bare particulars of the charges against defendant, but the judge did not read each indictment in its entirety and, in particular, did not recite the language pertaining to twelve or more grand jurors having concurred in each indictment.

**Am Jur 2d, Trial § 715.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment of life imprisonment upon defendant's conviction of first-degree murder entered by *Allen, J.,* at the 3 January 1989 Criminal Session of DURHAM County Superior Court. Defendant's motion to bypass the Court of Appeals with respect to the verdict of guilty of first-degree burglary was allowed on 20 September 1989. Heard in the Supreme Court 9 April 1990.

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

After review of the record and briefs and after oral argument of the parties, we conclude defendant received a fair trial free of prejudicial error. Consequently, we affirm defendant's sentence of life imprisonment for murder and the consecutive sentence of fifteen years for first-degree burglary.

Between 7:15 and 7:30 p.m. on 29 February 1988, seventeen-year-old Michael Rochelle woke from his sleep to hear a loud crashing noise coming from near his mother's bedroom at the front of the house. Running down the hall, he heard his mother scream his name, followed by five or six gunshots in rapid succession. When

Michael entered the bedroom, he saw defendant standing over the body of his mother, Patricia Rochelle, using both hands to aim a .22-calibre pistol at the victim. Hiding under the bed was Michael's seven-year-old brother, Eldon. His two-year-old brother, Steven, was standing directly in front of the body. On seeing Michael enter the bedroom, defendant turned, pointed the gun at Michael and began pulling the trigger. As Michael ran out of the room, he heard the gun click repeatedly.

Defendant had lived with Patricia Rochelle for five or six years before moving out of the home about the middle of October 1987. It was during this relationship that Patricia Rochelle gave birth to defendant's son, Steven. Defendant became a father figure to Michael and Eldon as well. After defendant moved out of the home, Patricia visited a lawyer on several occasions in an effort to collect child support for Steven from defendant. In December 1987, defendant married another woman, Miriam Faucette, with whom he was living at the time of the murder.

Michael testified at trial that in the afternoon before the murder defendant spoke with Michael by telephone. Defendant told Michael that he wished he could have another chance to come back to the Rochelle home to live as a family, and he expressed his desire to come by to see Michael and his brothers.

During this conversation another call came through, and Michael put defendant's call on hold. The other caller turned out to be Michael's mother, who stated that under no circumstances was defendant to visit, since defendant had neither bought diapers nor sent money since the time he left. Michael switched back to defendant and told him what Patricia had said. Defendant, who sounded depressed and cried a bit during the conversation, gave Michael his telephone number before hanging up.

A few minutes later Patricia called Michael to say that defendant had just spoken to her by telephone. According to Michael, defendant told Patricia, "I've been watching you when you least expect it. And I've been seeing you and I had all the options in the world to blow your m----f----- head off." Michael asked his mother why defendant said this and if she were sure that he said it. She responded that she was sure and that she did not know why. Shortly afterwards defendant called Michael by telephone again. Michael confronted defendant with this statement, which defendant denied.

STATE v. FAUCETTE

[326 N.C. 676 (1990)]

About 7:00 p.m. on the night of the murder, Patricia spoke by telephone with her sister, Carolyn Peace. Carolyn testified that during the conversation Patricia was upset. Patricia told her that the defendant "had called her on the job again, threatening her. And my sister told me that she told [defendant] to leave her alone . . . . She said that [defendant] had said he wanted to come back home. . . . She told him to leave her alone, to go home to his wife. . . . [Defendant] told her that he was going to put a bullet in her a--." As they were speaking, Carolyn heard a loud noise on the other end of the telephone line, and Patricia was cut off in midsentence by the sound of three gunshots fired in rapid succession. Before Carolyn hung up and called the police, she heard Patricia call for Michael in a loud, frightening voice.

Patricia suffered seven wounds, one a graze to the arm and the other six to the back. Of these six, one punctured the heart and lung; another, the lung only; and a third, the victim's left buttock. Officers investigating the scene found three distinct footprints on the front door, which was splintered near the knob. Michael led officers to a .22-calibre pistol containing six live rounds which they found where Patricia kept it on the top shelf of her bedroom closet.

Shortly after 10:00 p.m. that evening, defendant surrendered himself to police. Police recovered the murder weapon, an eight-shot .22 Regent revolver containing eight empty cartridge cases, soon thereafter.

Defendant's wife, Miriam Faucette, testified that she had never known defendant to exhibit any violent behavior or to speak in a profane manner. He was president of the White Rock Holiness Church male chorus. She stated that defendant was very close to his relatives and that he particularly loved his only son, Steven. She testified further that defendant had been depressed about not being able to visit Steven. After the shooting, defendant had called her to say he "had made a mess," that "[s]omething bad had happened." Defendant asked her to drive him to the Durham magistrate's office so that he could turn himself over to the authorities.

Roscoe Alston, Jr., testified that he had known defendant since early childhood and that they were like brothers. Defendant was a gentle person who would walk away from an argument. On cross-examination, Alston testified that he did not know anything about defendant breaking and entering the victim's home.

STATE v. FAUCETTE

[326 N.C. 676 (1990)]

Defendant testified that, when he entered the Rochelle home, he started talking with Patricia. She made some remark about knowing he would come, then "she started reaching" for what he thought was a gun, and he "started shooting." "I thought she was going to shoot me when I saw her go for her gun. That's what I thought she was going for. It wasn't intentionally. . . . I wanted to talk with her." On cross-examination, defendant admitted to using a single kick to open the front door and enter the victim's home without her consent. He testified that neither Eldon nor Steven was in the bedroom when he shot Patricia.

The jury found defendant guilty of first-degree murder under both the theories of premeditation and deliberation and of felony murder, with burglary being the underlying felony. Finding one aggravating circumstance and three mitigating circumstances, the jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance. Nonetheless, the jury declined to find that the aggravating circumstance of the burglary was sufficient to call for the imposition of the death penalty when considered with the mitigating circumstances. The trial judge sentenced defendant to life imprisonment in accordance with the jury's recommendation.

Defendant asserts that the trial court erred when it allowed Michael to testify as to the hearsay statements defendant allegedly made to Patricia Rochelle some six to eight hours prior to the shooting. Defendant asserts that the same error occurred when the trial court permitted Carolyn Peace to testify to similar hearsay statements. At the conclusion of a voir dire hearing, the trial court overruled defendant's objections on the ground that N.C.G.S. § 8C-1, Rule 803(3), permitted the admission of these statements. We find no error.

[1]  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1988). Michael testified that Patricia said she did not want defendant to come to the house since he had failed to provide support for his child. This testimony was not offered to prove the truth of the matter asserted — that defendant in fact failed to provide child support. Rather, the State offered the testimony to show that Patricia had made the statement to show her frustration and impatience with defendant and was thus relevant to explain her

initial prohibition of visits from defendant. "[E]vidence is not hearsay if offered only to prove that the declarant made the statement . . . ." *State v. Sauls*, 291 N.C. 253, 259, 230 S.E.2d 390, 393 (1976), *cert. denied*, 431 U.S. 916, 53 L. Ed. 2d 226 (1977). Thus, this testimony was not hearsay.

[2] The State also sought to admit those of Patricia's statements made to Michael and Carolyn indicating that the defendant had made threats and other comments to Patricia. These statements regarding defendant were hearsay and would be inadmissible unless covered within a hearsay exception.

Rule 803(3) permits the introduction of hearsay that is a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." N.C.G.S. § 8C-1, Rule 803(3) (1988). Patricia's statements regarding defendant's threat revealed her then-existing fear of defendant, further explaining why she did not want defendant visiting her home. The prohibition of visits to the home by the defendant was relevant to prove defendant's state of mind, that is, that he knew he was entering the Rochelle home without consent. *See State v. Locklear*, 320 N.C. 754, 760, 360 S.E.2d 682, 685 (1987) (testimony that rape victim stated she was "scared" and requested that defendant not be allowed near her admissible to show state of mind; relevant to show sexual intercourse committed by force and against victim's will); *State v. Walden*, 311 N.C. 667, 672, 319 S.E.2d 577, 580 (1984) (testimony that murder victim said she did not want to see defendant — "Please don't let him in," etc. — admissible to show state of mind). It was incumbent upon the State to prove that defendant entered the occupied home without consent to prove the burglary charge.

The evidence of Patricia's state of mind was also relevant to rebut defendant's self-defense inferences that he did not start shooting until he saw her reach "for her gun." The jury could infer from the evidence regarding her state of mind that it was unlikely that Patricia would do anything to provoke defendant, including reach for a weapon. *See United States v. Brown*, 490 F.2d 758, 768-69 (D.C. Cir. 1973), and cases cited therein.

Defendant urges that there was insufficient evidence for the trial court to rule on voir dire that defendant said he would "blow [the victim's] . . . head off." While it is true that Michael's description of his conversation with his mother lacked this statement of intent, Michael's subsequent description of his conversation with

defendant regarding the threats did include this statement. Thus, there was evidence to support the trial judge's ruling that defendant said "that he had chances to blow [the victim's] . . . head off and that he would do so." *See State v. Moorman*, 320 N.C. 387, 398, 358 S.E.2d 502, 509 (1987).

Defendant asserts further that the prejudicial effect of these statements outweighed any probative value, in violation of Rule 403. We disagree. Patricia's state of mind was relevant to rebut defendant's testimony as it pertained to the inference of self-defense, to show that the defendant entered the Rochelle home without consent, and to prevent the jury from being misled about why Patricia would not allow the defendant to visit the home. Thus, the probative value outweighed any prejudicial effect.

[3] Defendant contends as well that Michael's testimony about his mother's statements was so unreliable as to be inadmissible on constitutional grounds. *See State v. Porter*, 303 N.C. 680, 697, 281 S.E.2d 377, 388 (1981). "[A] sufficient inference of reliability can be made 'without more' from the showing that the challenged evidence falls within 'a firmly rooted hearsay exception.' " *Id.* at 697 n.1, 281 S.E.2d at 388 n.1 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608 (1980) ). The then-existing state-of-mind exception is firmly rooted in North Carolina jurisprudence. *See* 1 Brandis on North Carolina Evidence § 161 (1988). Furthermore, testimony from Carolyn Peace corroborated Michael's description of statements allegedly made by his mother. The fact that defendant did indeed break and enter the Rochelle home in the nighttime before shooting Patricia to death lends additional credence to Patricia's statements that defendant had threatened her.

Defendant objects as well to the testimony of Carolyn Peace regarding the statements made by her sister in the minutes before Patricia's shooting death for the same legal reasons that he objected to Michael's testimony. According to defendant, none of the statements to Carolyn revealed Patricia's then-existing state of mind, the statements were not relevant, and they were more prejudicial than probative. Lastly, defendant asserts that the inherent unreliability of these statements rendered the admission into evidence unconstitutional. For the reasons stated in our discussion of Michael Rochelle's testimony, we hold that the trial court properly admitted Carolyn Peace's testimony.

Defendant argues next that the trial court erroneously permitted Jeff Ellinger, Patricia Rochelle's attorney, to testify in rebuttal to statements that Patricia made to him when he met with her in a professional capacity on 29 October 1987 and subsequently in early January 1988. The trial judge ruled after a voir dire hearing that Ellinger's testimony was admissible under Rule 803(24), the catchall exception. We find that the error, if any, was harmless.

As an initial matter, we note that the trial court should have considered the matter under Rule 804(b)(5), the catchall hearsay exception applicable when the declarant is unavailable as a witness. However, this point is not determinative, as this section is otherwise identical to Rule 803(24). *State v. Triplett*, 316 N.C. 1, 7, 340 S.E.2d 736, 740 (1986).

Ellinger testified that Patricia retained him on 29 October 1987 to bring action against the defendant for child support and to procure an order to prevent defendant from coming near her. During the course of the attorney-client interview, Patricia related that defendant was "running around" with other women, that he was not giving her any money, and that she had asked him to leave. She also told Ellinger that she had initiated criminal charges against defendant for having broken into her mobile home a few days previously. Patricia also expressed her concern that defendant would not make timely payments on a loan for which she had pledged her automobile as collateral. In the January interview, Patricia appeared upset. Having heard that defendant had married, Patricia was concerned that she had received no child support payments and that she was going to lose her car.

Defendant argues that: (1) this testimony was not evidence of a material fact, (2) there was other more probative evidence available on this point, (3) the trial court failed to conclude that the statements were not covered by another hearsay exception, (4) the State gave defendant inadequate notice, and (5) Patricia's statements were not trustworthy. *See State v. Smith*, 315 N.C. 76, 92-98, 337 S.E.2d 833, 844-48 (1985) (setting out six-part inquiry for determining admissibility under Rule 803(24)), *cited in State v. Triplett*, 316 N.C. at 9, 340 S.E.2d at 740 (adopting *Smith* inquiry for Rule 804(b)(5) cases).

[4] The trial court found that Ellinger's testimony was evidence to the effect that defendant had not supported Steven and that it was therefore material. The requirement that the evidence be

material is "a mere restatement of the requirement of relevancy set out in Rules 401 and 402." *State v. Smith*, 315 N.C. at 94, 337 S.E.2d at 845. Prior to the introduction of this testimony, defendant had presented evidence to the effect that he loved his child and wanted to support him. From this testimony the jury could infer, and defendant ultimately argued, that he went to the Rochelle home on 29 February 1988, not with the intent to commit murder, but with the intent to talk to Patricia and see his child, Steven. Ellinger's testimony was appropriate to rebut this inference favorable to defendant. *State v. Avery*, 315 N.C. 1, 27-28, 337 S.E.2d 786, 801 (1985). Moreover, "ill-will or previous difficulty between the parties" is among the circumstances that a jury may consider in deciding that defendant killed with premeditation and deliberation. *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *judgment vacated*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987); *see also State v. Fountain*, 282 N.C. 58, 70-71, 191 S.E.2d 674, 683 (1972). Thus, Ellinger's testimony would also have been material to establish ill will between the parties from which the jury could infer premeditation and deliberation.

[5] The record supports the court's conclusion that Ellinger's statements were more probative than any other evidence available to the State. Where the declarant is unavailable, the necessity of using such hearsay testimony is greater than in Rule 803(24) cases, and the inquiry into the probative value "may be less strenuous." *State v. Triplett*, 316 N.C. at 9, 340 S.E.2d at 741. Only defendant and his victim were likely to have firsthand knowledge of their domestic difficulties. Thus, Patricia's hearsay accounts were the most probative evidence of any available to the State regarding the domestic problems existing between her and defendant.

[6] At trial, defendant argued strongly that the State failed to give adequate notice of its intent to use the statements. The State mailed its notice of intent on 30 December 1988. Counsel for defendant received the notice at his office on 2 January 1989, a legal holiday, while preparing for trial. The case came on for trial the next day. The State did not seek to present the evidence until 17 January 1989, fifteen days after defendant's counsel received the notice. We hold that fifteen days provided adequate notice, given that defendant himself was the best source for information about these statements and that no alternate investigation was

STATE v. FAUCETTE

[326 N.C. 676 (1990)]

likely to provide further information, as defendant's counsel conceded at trial.

[7] The court concluded that the attorney-client relationship was a sufficient guarantee of trustworthiness to admit Patricia's statements. The attorney-client relationship promotes a candid exchange of information. Given that Patricia's statements were regarding matters within her personal knowledge and that she had a motivation to speak truthfully with her attorney, we concur with the trial court's finding of trustworthiness in these statements. *See generally State v. Nichols*, 321 N.C. 616, 624-25, 365 S.E.2d 561, 566-67 (1988) (setting forth nonexclusive list of factors to consider in determining trustworthiness).

[8] Defendant calls to our attention the fact that the trial court failed to conclude that these statements were not otherwise admissible. The trial judge "must . . . determine that the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4)." *State v. Triplett*, 316 N.C. at 9, 340 S.E.2d at 741. We decline to adopt the State's interpretation that the necessary conclusion was implicit in the trial court's ruling and was therefore adequate to meet the *Triplett* requirement. Accordingly, we find that the failure to make the necessary conclusion constituted error.

"It is well established that the erroneous admission of hearsay, like the erroneous admission of other evidence, is not always so prejudicial as to require a new trial." *State v. Ramey*, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986). Evidence of defendant's guilt was overwhelming. Prior testimony indicated that ill will existed between the victim and defendant and that there had been a continuing disagreement over child support. Testimony regarding defendant's failure to make loan payments did little to prejudice defendant given prior evidence of ill will and irresponsibility. Evidence that defendant had previously forced entry into the Rochelle home was already before the jury in the form of defendant's statement to police. Evidence that defendant ran around with other women was not particularly inflammatory, especially in view of the fact that defendant married Miriam Faucette a mere four months after quitting his residence with Patricia and the fact that, after the marriage, he kept begging Patricia to let him come back. Nor were the prosecutor's closing references to this evidence particularly likely to have affected the jury's verdict. We conclude that under the facts of this case, there was no reasonable likelihood the jury

would have reached a different result had the court excluded this evidence. *See* N.C.G.S. § 15A-1443 (1988).

Defendant also asserts that admission of this hearsay evidence violated his rights under the sixth amendment of the federal Constitution and under article I, section 23 of our state Constitution. For the reasons we rejected this contention in the context of Patricia's statements offered through her son Michael, we reject them in this context as well.

[9] Defendant argues next that the State introduced inadmissible character evidence when the prosecutor asked Roscoe Alston, Jr., on cross-examination whether he knew that defendant had broken into Patricia's house on a previous occasion. The trial court determined that although the arrest warrant had been dismissed, the State was permitted to cross-examine Alston about specific instances of conduct since Alston had testified that defendant was "sort of a gentle type person" and that he had never observed defendant to be a violent person. Defendant asserts that evidence of breaking and entering is not relevant to rebut the character trait of nonviolence offered by defendant.

Without determining whether breaking into the homes of others rebuts evidence that one is a gentle type person, we find that any error which might have occurred was not prejudicial. Detective Simmons testified in the State's case-in-chief that the defendant told him that Patricia had charged defendant with breaking and entering. Thus, this evidence was already available for the jury's consideration.

[10] Defendant finally argues that the trial court read the bills of indictment to all prospective and eventual jurors during jury selection in violation of N.C.G.S. §§ 15A-1221(b) and -1213. N.C.G.S. § 15A-1221(b) states that "[a]t no time during the selection of the jury or during trial may any person read the indictment to the prospective jurors or to the jury." N.C.G.S. § 15A-1213 is substantially similar. Defendant did not object at the time.

The State concedes that the trial court did indeed read portions of the indictments to the prospective and eventual jurors. We note, however, that the court did not read each indictment in its entirety and, in particular, did not recite from the indictments the language pertaining to twelve or more grand jurors having concurred in each indictment.

N.C.G.S. §§ 15A-1213 and -1221 require the trial court to identify the parties and their counsel and to briefly inform the prospective jurors as to the name of the defendant, the charge, the date of the alleged offense, and the name of any victim alleged in the pleading. To comply with these requirements, the trial court may draw "information from the bills of indictment to the extent necessary to identify the defendant and explain the charges against him and the circumstances under which he was being tried." *State v. Leggett*, 305 N.C. 213, 218, 287 S.E.2d 832, 835-36 (1982). In the case before us, the trial court drew from the indictment the case number, defendant's name, and the victim's name and set out the bare particulars of the charges of murder and burglary as required by the statutes. "[T]he statement of the trial court was consistent with the spirit of each statute in question," and the trial court did not give the jurors "a distorted view of the case before them by an initial exposure to the case through the stilted language of indictments and other pleadings." *Id.* at 218, 287 S.E.2d at 836. We find no error.

In summary, we conclude that defendant received a fair trial free of prejudicial error.

No error.