STATE OF NORTH CAROLINA v. GREGORY STEWART LYNCH

No. 679A86

(Filed 26 July 1990)

**1. Homicide § 21.5 (NCI3d) — first degree murder — premeditation and deliberation — sufficiency of evidence**

Evidence was sufficient to permit the jury to determine defendant's guilt of first degree murder on a theory of premeditation and deliberation where it tended to show that, before the fatal stabbing, defendant had threatened the life of the victim and surreptitiously entered her home; witnesses observed a person matching defendant's description walking with the victim shortly before she was fatally wounded; fingerprints taken from an automobile at the scene of the killing matched those of defendant; a knife with the victim's blood on it was found near where defendant was arrested; a sheath in which this knife fit was located near the automobile on which defendant's fingerprints were found; and the victim was stabbed five separate times.

**Am Jur 2d, Homicide §§ 425, 426, 439.**

STATE v. LYNCH

[327 N.C. 210 (1990)]

2. **Homicide § 21.6 (NCI3d) — first degree murder — lying in wait — insufficiency of evidence**

Evidence was insufficient to support defendant's guilt of first degree murder on a theory of lying in wait where there was no evidence that defendant ambushed or surprised the victim when he fatally stabbed her; rather, the evidence showed without contradiction that before the fatal stabbing, defendant walked with his arm around the victim through the parking lot; later defendant was observed chasing the victim across the lot, catching her, and forcing her back to a car in the lot; the victim was heard to say, "No, please, don't do that," after which she was observed coming from between some cars, bleeding and calling for help; and defendant was observed running across the parking lot.

**Am Jur 2d, Homicide §§ 44, 47, 49.**

3. **Homicide § 21.6 (NCI3d) — alternate theories submitted to jury — only one supported by evidence — no indication by jury as to which theory relied on — prejudicial error**

Where the trial court erroneously submits the case to the jury on alternate theories, one of which is not supported by the evidence and the other which is, and, as here, it cannot be discerned from the record upon which theory or theories the jury relied in arriving at its verdict, the error entitles defendant to a new trial.

**Am Jur 2d, Homicide §§ 483, 486, 498.**

4. **Homicide § 17 (NCI3d) — defendant's prior entry into victim's home — admissibility to show intent, malice, identity of defendant**

In a prosecution of defendant for the murder of his estranged wife, the trial court did not err in admitting evidence of defendant's surreptitious entry into the victim's home approximately one month before the murder, since such evidence tended to show that defendant was seeking an opportunity to harm his wife; it was some evidence of defendant's malice, intent, and ill will toward his vicitm; and it therefore tended to identify defendant as his wife's assailant when she was murdered.

**Am Jur 2d, Evidence §§ 321, 322, 324, 325.**

STATE v. LYNCH

[327 N.C. 210 (1990)]

### 5. Homicide § 17.2 (NCI3d); Criminal Law § 73.3 (NCI3d) — statements by murder victim — admissibility to show state of mind

Testimony by three witnesses that the victim had told them that defendant, her husband, had threatened her and that the victim, when speaking about her husband shortly before the murder, was "nervous and upset," unusually quiet, and had "fear in her voice" was admissible to show the state of mind of the victim and the relationship between her and her husband shortly before her murder. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Homicide §§ 329, 330.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a conviction of first degree murder and judgment sentencing him to death imposed by *Hyatt, J.*, presiding at the 13 October 1986 Criminal Session of Superior Court, RUTHERFORD County. Heard in the Supreme Court 13 February 1989.

*Lacy H. Thornburg, Attorney General, by Christopher P. Brewer, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant appellant.*

EXUM, Chief Justice.

At defendant's trial for first degree murder the jury was instructed that it could find defendant guilty on a theory of premeditation and deliberation or on a theory of lying in wait. The jury returned a general verdict of guilty without specifying upon which theory or theories it relied.

While the evidence was sufficient to support a verdict on a theory of premeditation and deliberation, the evidence was insufficient to support a verdict on a theory of lying in wait. It was reversible error, therefore, to submit the case to the jury on a theory unsupported by the evidence; and defendant must be given a new trial. We also conclude there was no error in the admission of certain evidence against defendant.

STATE v. LYNCH

[327 N.C. 210 (1990)]

## I.

Defendant was indicted by the Grand Jury of Rutherford County at the 21 July 1986 Criminal Session of Superior Court for the offense of first degree murder. He was tried capitally in the Superior Court of Rutherford County in October 1986 and found guilty of first degree murder. After a sentencing hearing, the jury found the presence of one aggravating circumstance, that the defendant previously had been convicted of a felony involving the use or threat of violence to a person. The jury found one mitigating circumstance, that the murder occurred while defendant was under the influence of a mental or emotional disturbance. It failed to find that defendant's capacity to appreciate the criminality of his conduct was impaired and that there were any other unspecified mitigating circumstances. The jury determined that the mitigating circumstance was insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to warrant the death penalty. The jury recommended that defendant be sentenced to death. For the statutory authorization for these findings at sentencing, see N.C.G.S. § 15A-2000(e)(3), (f)(2), (c)(2) and (3).

The State's evidence tends to show the following:

On 21 June 1986 at around 11:45 p.m. the victim, Jackie Lynch, was stabbed repeatedly in the parking lot of Spindale Mills, where she worked third shift. She was pronounced dead on arrival at Rutherford County Hospital.

Defendant and Jackie Lynch were married but had been separated for approximately two months before Jackie was killed.

On the morning of 18 May 1986 defendant surreptitiously entered Jackie's home and was discovered by Duprey McDowell, Jackie's son. McDowell escaped through a window and called the police from a neighbor's house. The police found defendant hiding in the basement. Although he was arrested, charges stemming from the incident were dismissed for lack of probable cause. On 19 May 1986 Jackie told Officer Floyd Laughter that defendant had previously telephoned her and threatened to have her killed.

On 21 June 1986 Jackie told two friends, Sharon Pruitt and Gloria Edgerton, that defendant's threats to kill her had frightened her.

STATE v. LYNCH

[327 N.C. 210 (1990)]

About 7:40 p.m. on 21 June 1986 Tony Latham picked up defendant in front of Spindale Drug Store and drove him about one-quarter mile to Petroleum World, a local service station about one-quarter mile from Spindale Mills. Around 11:30 p.m. Ruby Taylor, Robert Lee Barnes and Debbie Hutchins, all third shift employees of Spindale Mills, arrived for work. They saw a black man sitting on the hood of a blue Dodge Daytona parked near the entrance of the parking lot. Hutchins said the black man looked at each car that came into the parking lot. Barnes said the man kept his back to him and never showed his face. Fingerprints lifted from the hood of the Dodge Daytona by an SBI special agent matched those of defendant.

Jackie Lynch arrived at the mill for work around 11:45 p.m. Tim Stamper, another third shift employee, observed a black man and Jackie walking through the parking lot. The man had his arm around Jackie. Moments later Stamper observed the same black man running across the parking lot as Jackie emerged from between some cars with blood all over her, screaming "Help me, help me," before falling down. Floyd Fowler, an employee of the mill who did not know Jackie, observed a black man chasing a black woman across the parking lot. Fowler saw the man catch the woman and lead her back to the car. As they started to move, Fowler heard her say, "No, please, don't do that." A few moments later she said, "Somebody help me." When Fowler went to the parking lot to investigate, he saw the man running across the parking lot and the woman walking out to the center of the parking lot saying, "Will somebody please help me."

Officer Randy Bostic of the Spindale Police Department was dispatched to the Spindale Mills parking lot and arrived just before midnight. Upon examination of Jackie Lynch's body, he detected no pulse. He discovered a knife sheath next to the blue Dodge Daytona. Defendant's fingerprints were found on the Dodge Daytona and on Jackie's Plymouth Valiant. Jackie's car also contained blood which matched her blood grouping. Bostic said witnesses described the suspect as a black man wearing light trousers, a red shirt and a baseball cap.[1]

---

1. There was some discrepancy between Stamper's and Fowler's descriptions of the suspect. Stamper identified the black male as wearing light trousers. Fowler said he thought the suspect was wearing dark trousers and a lighter colored shirt.

STATE v. LYNCH

[327 N.C. 210 (1990)]

About 3:15 a.m. on 22 June defendant was arrested some two-tenths of a mile from Spindale Mills. He was wearing light colored trousers, a red shirt and a baseball cap and had blood on his clothes and arms. Defendant was bleeding from wounds on his upper arms. A knife was found on the ground a few feet from where defendant was apprehended. No usable fingerprints were found on the knife, but the knife did have blood on it matching that of Jackie Lynch and not that of defendant.

Defendant was taken to the Rutherford County Hospital for treatment and then to jail. He possessed a key fitting the ignition of Jackie Lynch's car.

Jackie Lynch was dead on arrival at Rutherford County Hospital. Cause of death was shock due to loss of blood from multiple stab wounds.

Defendant offered no evidence in the guilt phase of the case.

## II.

[1] Defendant first contends the evidence was insufficient to show that he committed the murder with which he was charged and the trial court erred in denying his motion to dismiss the case for insufficiency of evidence. We conclude the evidence was sufficient to be submitted to the jury on the question of defendant's guilt of first degree murder on a theory of premeditation and deliberation.

The question is whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense. *State v. Mercer*, 317 N.C. 87, 96, 343 S.E.2d 885, 890 (1986).

> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). . . . If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion to dismiss should be allowed. This is true even though the suspicion so aroused by the evidence is strong.

*State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (citation omitted). In determining the sufficiency of the evidence we consider it in the light most favorable to the State.

> [T]he State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.

*Id.* at 67, 296 S.E.2d at 653. The test for sufficiency of the evidence is the same whether the evidence is direct, circumstantial or both. *Id.* at 68, 296 S.E.2d at 653.

> When as here the motion to dismiss puts into question the sufficiency of circumstantial evidence, the court must decide whether a reasonable inference of the defendant's guilt may be drawn from the circumstances shown. If so the jury must then decide whether the facts establish beyond a reasonable doubt that the defendant is actually guilty.

*State v. Triplett*, 316 N.C. 1, 5, 340 S.E.2d 736, 739 (1986) (citation omitted).

These formulations of the sufficiency of the evidence comport with the United States Supreme Court's articulation that as a matter of constitutional due process the evidence in a criminal case, after it is viewed in the light most favorable to the prosecution, must be such that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573 (1979). *See State v. Blake*, 319 N.C. 599, 604, 356 S.E.2d 352, 355 (1987).

Here the evidence, although circumstantial, was sufficient to permit the jury to determine defendant's guilt of first degree murder on a theory of premeditation and deliberation beyond a reasonable doubt. Before the fatal stabbing, defendant had threatened the life of the victim and surreptitiously entered her home. Witnesses observed a person matching defendant's description walking with the victim shortly before she was fatally wounded. Fingerprints taken from an automobile at the scene of the killing matched those of defendant. A knife with the victim's blood on it was found near where defendant was arrested, and a sheath in which this knife fit was located near the automobile on which defendant's fingerprints were found. The victim was stabbed five separate times.

Even if each of these circumstances standing alone would be insufficient to raise more than a mere suspicion of defendant's

guilt, all the circumstances taken together are clearly sufficient to permit the jury to find beyond a reasonable doubt that defendant perpetrated the murder, *see Blake*, 319 N.C. 599, 356 S.E.2d 352, and cases therein cited; *State v. Thomas*, 296 N.C. 236, 250 S.E.2d 204 (1978), and that he did so with premeditation and deliberation. *See State v. Groves*, 324 N.C. 360, 378 S.E.2d 763 (1989).

### III.

[2] Defendant next contends the evidence was insufficient to support his guilt of first degree murder on a theory of lying in wait and the trial court erred in submitting this alternative theory of guilt to the jury. This argument has merit.

A "murder perpetrated by lying in wait is a murder in the first degree." *State v. Leroux*, 326 N.C. 368, 375, 390 S.E.2d 314, 320 (1990). If the State can show a murder perpetrated by lying in wait, it need not prove either premeditation and deliberation or a specific intent to kill. *Id.*

For a murder to be perpetrated by lying in wait, it is not necessary that the perpetrator wait at the site of the killing for some period of time or that he be concealed or that the victim be unaware of his presence. *Leroux*, 326 N.C. 368, 390 S.E.2d 314; *State v. Allison*, 298 N.C. 135, 257 S.E.2d 417 (1979). Both *Leroux* and *Allison* and cases relied upon therein do establish, however, that a lying in wait killing requires some sort of ambush and surprise of the victim.

In *Leroux* a lying in wait killing was committed when defendant was "sneaking around" a dark golf course at night in a crouched position with a loaded, cocked rifle and fatally shot a police officer searching for him "with a suddenness which deprived [the officer] of all opportunity to defend himself." *Leroux*, 326 N.C. at 376-77, 390 S.E.2d at 320-21. *Leroux* relied on *State v. Bridges*, 178 N.C. 733, 101 S.E. 29 (1919), where police officers entered defendants' home to make an arrest. Inside the house an officer, upon turning a corner, was suddenly and fatally shot by defendants. The *Bridges* Court characterized the killing as one where the victim "had no time even to raise his pistol in defense of himself. The defendants were waiting in the dark for him, as much concealed as if they had been hidden in ambush, prepared to slay without a moment's warning to their victim." *Bridges*, 178 N.C. at 738, 101 S.E. at 32.

STATE v. LYNCH

[327 N.C. 210 (1990)]

In *Allison* the defendant surreptitiously followed his wife to her trailer. She entered the trailer, and defendant stationed himself some 150 feet away behind or beside a tree. When his wife came out of the trailer defendant fatally shot her from his position at the tree. The *Allison* Court concluded the evidence supported a killing by lying in wait. After reviewing earlier decisions, the Court said:

> The foregoing decisions make it clear that when G.S. 14-17 speaks of murder perpetrated by lying in wait, it refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim. An assailant who watches and waits in ambush for his victim is most certainly lying in wait. However, it is not necessary that he be actually concealed in order to lie in wait. If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait. Certainly one who has lain in wait would not lose his status because he was not concealed at the time he shot his victim. The fact that he reveals himself or the victim discovers his presence will not prevent the murder from being perpetrated by lying in wait. Indeed, a person may lie in wait in a crowd as well as behind a log or a hedge.

*Allison*, 298 N.C. at 147-48, 257 S.E.2d at 425 (citations omitted).

Although concealment is not a necessary element of a murder perpetrated by lying in wait, it is clear from this Court's prior decisions that some sort of ambush and surprise of the victim are required. "Even a moment's deliberate pause before killing one unaware of the impending assault and consequently 'without opportunity to defend himself' satisfies the definition of murder perpetrated by lying in wait." *Leroux*, 326 N.C. at 376, 390 S.E.2d at 320 (quoting *State v. Wiseman*, 178 N.C. 784, 790, 101 S.E.2d 629, 631 (1919)).

Here there is no evidence that defendant ambushed or surprised Jackie Lynch when he fatally stabbed her. The evidence shows without contradiction that before the fatal stabbing defendant walked with his arm around the victim through the parking lot. Later defendant was observed chasing the victim across the lot, catching her and forcing her back to a car in the lot. The

STATE v. LYNCH

[327 N.C. 210 (1990)]

victim was heard to say, "No, please, don't do that," after which she was observed coming from between some cars, bleeding and calling for help. Defendant was observed running across the parking lot. There is simply no evidence that defendant lay in wait by ambushing or surprising his victim immediately before he inflicted the fatal stab wounds. Such evidence as there is tends to the contrary.

[3]  There being no evidence to support murder by lying in wait, it was error for the trial court to instruct the jury on this theory. Where the trial court erroneously submits the case to the jury on alternative theories, one of which is not supported by the evidence and the other which is, and, as here, it cannot be discerned from the record upon which theory or theories the jury relied in arriving at its verdict, the error entitles defendant to a new trial. *State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987).

IV.

[4]  Defendant next contends evidence of his surreptitious entry into Jackie Lynch's home on 18 May 1986 should have been excluded because it is not relevant to any issue in the case and simply tends to show that defendant had been arrested for an unrelated offense. We disagree.[2]

Rule 404(b) of the North Carolina Rules of Evidence states that while "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show he acted in conformity therewith," it may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1988).

"When a husband is charged with murdering his wife, the State may introduce evidence covering the entire period of his married life to show malice, intent and ill will toward the victim." *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985); *accord State v. Creech*, 229 N.C. 662, 670, 51 S.E.2d 348, 354 (1949). The 18 May incident directly relates to Jackie's and defendant's relationship shortly before the murder. It is simply one circumstance which tends to shed light on the crime itself by showing that approximately a month before the crime defendant may have

---

2. Since this question and the one following will almost certainly arise at defendant's new trial, we elect to discuss them here for guidance at the new proceeding.

been seeking an opportunity to harm his wife. It is some evidence of defendant's malice, intent and ill will toward his victim and thereby tends to identify defendant as his wife's assailant when she was murdered. It was not error to admit this evidence.

## V.

[5] Defendant next contends that it was error to admit certain statements concerning defendant made by Jackie Lynch to several witnesses. Defendant argues the evidence was inadmissible hearsay. Again, we disagree and conclude the evidence was admissible under the state-of-mind exception to the hearsay rule.

During the presentation of the State's case, Gloria Edgerton testified that she and Jackie Lynch walked together to the Spindale Mills parking lot after they got off work at 8 a.m. on 21 June 1986. Jackie said, "I'm scared to go out there." Defendant objected, the jury was excused and the trial court conducted a *voir dire* on the admissibility of Edgerton's testimony. During the *voir dire* Edgerton testified that on the morning of 21 June, Jackie Lynch told her that defendant had threatened to kill her. She also testified that earlier in the week, she and Jackie Lynch had discussed Jackie's marital situation. Jackie told Edgerton that defendant had wanted to come back to her. When Jackie refused, defendant threatened her life. The trial court ruled this testimony admissible as a dying declaration under Rule 804(b)(2).

After this ruling and before the jury, Edgerton testified essentially as follows: She and Jackie Lynch were close friends and often mutually confided in each other about their problems. On the morning of 21 June Edgerton noticed that Jackie was acting differently. She was not as talkative and smoked more. It "seemed like she had things on her mind." Jackie told Edgerton that defendant had threatened her life. As the two women were approaching the parking lot Jackie said, "My tires may be flat."

Sharon Pruitt testified that she had known Jackie Lynch for twenty-five years and was defendant's first cousin. Jackie Lynch was like a sister and they confided in each other. They talked with each other almost every day. On the afternoon of 21 June, Pruitt said Jackie Lynch called her on the telephone and identified herself. During a *voir dire* hearing on the admissibility of Pruitt's testimony concerning the telephone conversation, she testified that she had made a written notation of what was said. She said Jackie

STATE v. LYNCH

[327 N.C. 210 (1990)]

Lynch told her, "Sharon, I know Gregg is going to kill me, like he said he would do." Pruitt, describing Jackie Lynch, said: "I could tell she was frightened. She had fear in her voice."

Again the trial court concluded this testimony was admissible as a dying declaration.

Before the jury Pruitt testified essentially as she had on *voir dire*. The trial court allowed the motion to strike the witness' testimony that Jackie "had fear in her voice" but allowed the witness to testify that she knew defendant was going to kill her, "like he said he would."

Over defendant's objection the trial court, after making appropriate findings, permitted police officer Floyd Laughter to testify under the residual exception to the hearsay rule, N.C.G.S. § 8C-1, Rule 804(b)(5) (1988). Officer Laughter testified he spoke with Jackie Lynch at her residence on 19 May 1986 while he was investigating an unauthorized entry. He described Jackie Lynch as being "very nervous and upset," unable to stand still and constantly pacing the floor. She told him defendant "had called her on the phone on the previous day and told her that he was going to have her killed."

In admitting Officer Laughter's testimony under the residual hearsay exception, Rule 804(b)(5), the trial court made findings and conclusions as follows:

> THE COURT: Let the record show in regard to the statement made by Floyd Laughter in regard to a telephone conversation that Jackie Lynch had with Gregg Lynch, the Court overruled the objection made by the defendant, pursuant to Rule 804(b)(5). The Court determines that the statement [was] offered as evidence on a material fact. . . . The statement is more probative on the point [for] which it is offered than any other evidence which the State can procure through reasonable efforts; that there were circumstantial guarantees of trustworthiness insofar as the statement made to an officer on the day after the telephone conversation subsequent to the time she contacted the police in the course of his investigation; that the interest of justice would be served by admission of the statement in evidence.

Defendant contends the trial court, in following the steps for admission under the residual hearsay exception as enunciated in *Triplett*, 316 N.C. 1, 340 S.E.2d 736, erred in concluding that the

necessary circumstantial guarantees of trustworthiness were present. He also contends the trial court erred in admitting Jackie Lynch's statement to witnesses Pruitt and Edgerton under the dying declaration hearsay exception.

We need not address these arguments because here Officer Laughter's testimony, as well as the testimony of Edgerton and Pruitt, is admissible under the state-of-mind hearsay exception, Rule 803(3). "When a hearsay statement is made expressly admissible by a specific exemption category, there is no necessity for the trial court to consider the catch-all provisions of the other rules." *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1988). Jackie Lynch's statements to Edgerton, Pruitt and Officer Laughter regarding threats made by defendant on her life and how these threats affected her would be hearsay and therefore inadmissible unless they fall within an exception to the hearsay rule.

Under recent decisions of this Court, *State v. Faucette*, 326 N.C. 676, 392 S.E.2d 71 (1990); *Cummings*, 326 N.C. 298, 389 S.E.2d 66; *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983), these hearsay statements are admissible under the state-of-mind exception to the hearsay rule:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (3) Then Existing Mental, Emotional, or Physical Condition—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . .

N.C.G.S. § 8C-1, Rule 803(3) (1988).

In *Faucette*, a homicide and burglary victim's statements to her son and sister regarding threats the defendant, an estranged boyfriend, had made to the victim, although hearsay, were held admissible under Rule 803(3) because they revealed the victim's then-existing fear of the defendant. *Faucette*, 326 N.C. at 683, 392 S.E.2d at 74. The state of mind of the victim was relevant in the burglary case, the Court concluded, to show that defendant entered the victim's home without her consent. The Court concluded it was relevant in the homicide case to rebut the defendant's

STATE v. LYNCH

[327 N.C. 210 (1990)]

"self-defense inferences that he did not start shooting until he saw her reach 'for her gun.'" *Id.* The Court said, "The jury could infer from the evidence regarding [the victim's] state of mind that it was unlikely [she] would do anything to provoke defendant, including reach for a weapon." *Id.* at 683, 392 S.E.2d at 74-75.

In *Cummings*, the victim, Karen Puryear, had two children fathered by the defendant, an estranged boyfriend, at the time of the victim's murder. The victim and defendant had engaged in litigation over custody and support of these children. The State's evidence tended to show that Puryear and her younger sister, Teresa, were shot to death by the defendant. At trial, Celia Mansary, an East Central Community Services paralegal, testified she interviewed Puryear about three weeks before her disappearance. During the interview, Puryear told Mansary the defendant threatened to kill her if she tried to take the children from him. Although the trial court had apparently admitted this testimony under the residual hearsay exception of Rule 803(24), it failed to make the necessary findings required by *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). The Court nevertheless found no error in the admission of this evidence, concluding that it was admissible under the state-of-mind hearsay exception. The Court said Mansary's testimony tended to show the victim's existing state of mind and emotional condition and was admissible if relevant to some issue in the case and if its prejudicial effect did not outweigh its probative value. *Cummings*, 326 N.C. at 313, 389 S.E.2d at 74. The Court concluded that Puryear's state of mind was "highly relevant as it relates directly to the status of her relationship with defendant prior to her disappearance. The probative value of this evidence outweighs any potential prejudice to defendant." *Id.*

In *Alston*, 307 N.C. 321, 298 S.E.2d 631, decided under common law principles before our adoption of the Rules of Evidence, the Court noted that evidence regarding a homicide victim's fear of the defendant may be admissible provided it is accompanied by some factual basis for that fear. We said:

> Evidence of a victim's fear of the defendant is subject to misuse. Therefore, the naked assertion by a victim prior to his death that he fears the defendant should not be admitted into evidence absent some evidence tending to show a factual basis for such alleged fear.

*Id.* at 328, 298 S.E.2d at 637.

Here, the complained-of testimony was admissible under *Alston*, a pre-Rules case, and under Rule 803(3), as interpreted by *Faucette* and *Cummings*, to show the state of mind of Jackie Lynch and the relationship between her and her husband, defendant, shortly before her murder. The three witnesses testified that Jackie Lynch, when speaking about her husband shortly before the murder, was "nervous and upset," unusually quiet and had "fear in her voice."[3] Evidence of the threats made by defendant was admissible to explain Jackie Lynch's then-existing mental and emotional state, vis-a-vis defendant, as described by the witnesses. As in *Cummings*, the evidence was more probative than prejudicial; there was no error in its admission.

For the reasons given, defendant must have a

New trial.

---

3. Pruitt testified that the victim had fear in her voice. Although this testimony was stricken from the record, it may be allowed as it defines the state of mind of the victim. Other witnesses' testimony clearly described the victim as acting differently than she normally did before she described the defendant's threats.