STATE OF NORTH CAROLINA v. LACY DOUGLAS HOCUTT, Defendant

No. COA05-473

(Filed 2 May 2006)

**1. Appeal and Error— incriminating statement—properly admitted—not harmless, but not error**

A first-degree murder defendant's recorded jailhouse telephone statement that he was "getting back" at the victim when he shot him would not have been harmless (although there was no error) where defense counsel was arguing for second-degree murder based on a lack of premeditation.

STATE v. HOCUTT

[177 N.C. App. 341 (2006)]

**2. Arrest— defendant initially detained as intoxicated—unable to provide shelter for himself—no Fourth Amendment violations**

The initial seizure and incarceration of a first-degree murder defendant, which led to a recorded inculpatory telephone conversation, did not violate defendant's Fourth Amendment rights where defendant (who had consumed much alcohol during the day) was observed staggering, barefoot, dirty and very scratched up on the shoulder of a highway in an isolated area late at night. He was apparently in need of and unable to provide for himself clothing and shelter, and N.C.G.S. § 122C-303 allows an officer to take an intoxicated person to jail under these circumstances.

**3. Arrest— defendant initially detained as intoxicated—unable to provide shelter for himself—no deprivation of counsel**

Defendant's initial confinement for detoxification under N.C.G.S. § 122C-303, which led to an incriminating recorded telephone statement, did not deprive him of his right to counsel. Defendant was charged the next morning, advised of his rights, requested counsel, and counsel was appointed at his first appearance (but after the incriminating conversation). Defendant does not dispute that he received a timely first appearance or that counsel was then appointed.

**4. Confessions and Incriminating Statements— statement after right to counsel invoked—recorded jailhouse telephone call to girlfriend**

The police did not impermissibly elicit statements from defendant after he invoked his right to counsel where defendant made incriminating statements to his girlfriend in a recorded jailhouse telephone call. Although a detective told the girlfriend some facts which she discussed with defendant, she was not acting as an agent of the State.

**5. Bail and Pretrial Release— first-degree murder—no bond—no abuse of discretion**

There was no refusal to exercise discretion in the court's setting of "no bond" in a first-degree murder case, as the court had the discretion to do.

## 6. Constitutional Law— right of confrontation—DNA report—testimony from agent who did not perform tests

The trial court did not err by permitting an SBI agent to testify about the results of DNA tests performed by another agent who did not testify. It has been held that such testimony is non-testimonial under *Crawford v. Washington*, 541 U.S. 36, and thus does not violate the Confrontation Clause.

## 7. Homicide— first-degree murder—evidence sufficient

There was sufficient evidence for a charge of first-degree murder where there was a history of violence and hostility between the parties, there was an incident on the night of the shooting, defendant twice said that he ought to shoot the victim, he told his girlfriend to stop the car and got a beer and a gun from the trunk, a beer can with defendant's DNA and sunglasses with his fingerprint were found near the victim, and defendant later said that he shot the victim because of an earlier incident in which the victim shot him.

## 8. Discovery— violation—mistrial denied—no abuse of discretion

The trial court did not abuse its discretion by denying defendant's motions to dismiss and for a mistrial for discovery violations by the State, given the court's attention to the violation and its willingness to allow defendant time to contact experts.

Appeal by defendant from judgment entered 3 September 2004 by Judge Jack W. Jenkins in the Superior Court in Johnston County. Heard in the Court of Appeals 2 November 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Edwin W. Welch, for the State.*

*Cheshire, Parker, Schneider, Bryan & Vitale, by John Keating Wiles, for defendant-appellant.*

HUDSON, Judge.

In May 2003, defendant was charged with first-degree murder. The defendant's trial began on 16 August 2004 and on 3 September 2004, the jury convicted defendant of first-degree murder. Following a sentencing hearing, the court sentenced defendant to life imprisonment without parole. Defendant appeals. For the reasons discussed below, we conclude that there was no error.

The evidence tends to show the following facts. In 1991 or 1992, Brent Turner and a friend went to defendant's home and began harassing defendant's ex-wife's brother. When defendant went outside to see what was happening, Turner ran over defendant with his car and after defendant got up and chased the car, Turner's companion shot defendant twice, causing serious injury. Although defendant won a $120,000 civil judgment against Turner, he had never been able to collect anything on it. Thereafter, defendant felt that when he saw Turner, that Turner would "always smile at [defendant] and stuff, like, well, I got away with it or whatever."

On the morning of 8 May 2003, defendant drank three or four beers before leaving for work at 6:00 a.m. He took to work eight or nine beers in a cooler, which was empty when he returned home. He also stopped and drank some "white liquor" with a friend on his way home. Once home, he had another four or five beers. Around 6:00 p.m., defendant's live-in girlfriend, Barbara Langston, drove defendant, defendant's brother, and her children to Popeye's Gas and Grill, a local gas station and convenience store. As they were leaving Popeye's, Turner was pulling in on his red moped, and as he passed Langston's car, he "flipped [defendant] the bird" and yelled "f— you" at him. Defendant yelled "f— you" back at Turner. Langston began driving to her father's house for a cookout and defendant twice stated that he "ought to shoot the motherf——." Langston testified that after she turned onto Branch Chapel Church Road, defendant demanded that she stop the car and let him out; he threatened to "beat [her] ass" if she did not. Langston complied and defendant got out, got his gun from the trunk, and Langston handed him a Busch beer at his request. She left him standing on the side of Branch Chapel Church Road with the gun in his hand. Langston later told a detective that she thought defendant was going to shoot Turner. The State presented evidence that the most direct route from Popeye's to Turner's house was via Branch Chapel Church Road and that defendant was aware of this.

At trial, a resident of Branch Chapel Church Road testified that on 8 May 2003, around 6:15 or 6:30 p.m., she was in her yard and just after she saw a man drive by on a moped, she heard two gunshots. The moped was later found 25 to 50 feet from her driveway. At about 6:30 p.m., a citizen saw a moped on the road and Turner on the side of the road. Turner's face from "his nose down to his chin, was gone." The citizen called 911 and rescue workers arrived shortly before 7:00 p.m. and transported Turner to the hospital. Turner died several days later.

STATE v. HOCUTT

[177 N.C. App. 341 (2006)]

Detectives and a crime scene investigator from the Johnston County Sheriff's office arrived at the crime scene beginning around 7:15 p.m. They found a Busch beer can, a pair of sunglasses, and an empty 12-gauge shotgun shell casing in the woods near where Turner was found. They also saw muddy footprints made by bare feet. Forensic testing revealed defendant's fingerprint on the sunglasses and his DNA on the beer can. About two weeks later, a logger found a shotgun in the wooded area near the crime scene. Forensic examination could not determine that the casing found by the side of the road or the pellets removed from Turner came from this gun, but did reveal that the gun had been fired.

When Detectives Scott Richardson and Bengie Gaddis of the Johnston County Sheriff's office left the crime scene at around 11:30 p.m. to return to Selma, they saw the defendant walking down the road barefooted. He had scratches all over his body, was very dirty, and was staggering. The officers recognized defendant and observed that he was very intoxicated. They placed him in handcuffs and took him to jail for "detox purposes," "to sober up." The next morning defendant was charged with assault with a deadly weapon with intent to kill inflicting serious injury, and attempted murder. Defendant remained in custody and on 12 May 2003 after Turner died, he was charged with first-degree murder. While at the Johnston County Detention Center, defendant made incriminating statements over the phone to Langston and to his brother which were recorded, pursuant to jail policy. Inmates receive an informational handbook regarding this policy, notices are posted in the cell blocks notifying defendants that their telephone calls are monitored, and before being connected, both the caller and the person being called hear a recorded warning that "all calls are subject to monitoring and recording," except for "attorney calls." Defendant's recorded statements that he shot Turner were introduced by the State at trial.

At trial, defendant did not testify and presented only one witness: Dr. Katayoun Tabrizi, a psychiatrist. She testified that in her opinion, defendant suffered from alcohol dependence and personality changes after a previous head trauma. She opined that these conditions caused loss of impulse control and that on 8 May 2003 defendant "would have been severely impaired in knowing what he was doing, what he was doing would result in . . . . some consequences." Tabrizi also testified that defendant told her that he shot Turner and that "I just wanted to shoot him just as they shot me." He also told her that he did not intend to kill Turner.

**[1]** Defendant first argues that the trial court committed constitutional error when it permitted his recorded telephone conversations to be used against him. Defendant argues that his initial seizure and incarceration violated his Fourth, Fourteenth, and Sixth Amendment rights under the United States Constitution. We disagree. We note at the outset that

> [a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

N.C. Gen. Stat. § 15A-1443(b) (2005). The State asserts that any error was harmless beyond a reasonable doubt, in light of the other evidence against defendant and his own concession at trial, through counsel, that he shot Mr. Turner. However, defendant was charged with first-degree murder by premeditation, deliberation, and lying in wait, and defense counsel was arguing for the lesser-included offense of second-degree murder, based on lack of evidence of specific intent to kill, premeditation or deliberation, and lying in wait. Thus, we cannot conclude that the court's admitting defendant's recorded statement, "Why'd I do it? The mother f—— shot me didn't he . . . I shot his God damn ass back," was harmless beyond a reasonable doubt. We do conclude, though, that the trial court did not err, as the statement was not obtained in violation of defendant's constitutional rights.

**[2]** The Fourth Amendment to the United States Constitution and Article 22 of the North Carolina Constitution grant persons the right to be free from unreasonable search and seizure. Here, defendant was initially seized pursuant to a public intoxication statute and defendant argues that because the statutory requirements were not met, that the seizure violated his constitutional rights. N.C. Gen. Stat. § 122C-303 (2002) provides, in pertinent part, that

> an officer may assist an individual found intoxicated in a public place by directing or transporting that individual to a city or county jail. That action may be taken only if the intoxicated individual is apparently in need of and apparently unable to provide for himself food, clothing, or shelter but is not apparently in need of immediate medical care and if no other facility is readily available to receive him.

*Id.* Because the evidence shows that defendant was observed staggering, barefoot, dirty, and very scratched up on the shoulder of a

highway in an isolated area late at night, we conclude that he was "apparently in need of and apparently unable to provide for himself" clothing and possibly shelter. Defendant has not argued that there was no other facility available to receive him.

Defendant cites *Davis v. Town of Southern Pines*, 116 N.C. App. 663, 449 S.E.2d 240 (1994), *disc. review denied*, 339 N.C. 737, 454 S.E.2d 648 (1995), in support of his argument that the statutory requirements were not met. In addition to being a civil rather than a criminal case, we conclude that the facts of *Davis* make it readily distinguishable. In *Davis*, the Court concluded that N.C. Gen. Stat. § 122C-303 did not allow police to take a woman to jail after police saw her stumble on the sidewalk, approached her, and offered assistance which she refused. *Id.* at 672, 449 S.E.2d at 245-46. However, when approached by the police, Davis stated she was going to call a cab to take her home and her sister, who was with her, offered to call a cab and take care of her. *Id.* Defendant suggests that Officer Gaddis was required to transport defendant to his and Langston's home because he allegedly knew where they lived. But the statute plainly states that an officer may take an intoxicated person home, just as an officer may take an intoxicated person to jail if the conditions described above are met. N.C. Gen. Stat. § 122C-303. We overrule this assignment of error.

[3] Defendant also argues that his detention deprived him of his "liberty interest in seeking counsel," in violation of his Fourteenth Amendment rights. Defendant cites no case law in support of his contention that the Fourteenth Amendment confers such a right and we conclude that this argument lacks merit.

Defendant correctly asserts that under the Sixth Amendment, a person charged with a crime is entitled to counsel. *See Powell v. Alabama*, 287 U.S. 45, 66, 77 L. Ed. 158, 169 (1932). Defendant also correctly notes that this right to counsel attaches before the commencement of trial, as the accused "requires the guiding hand of counsel at every step in the proceedings against him." *Id.* at 69, 77 L. Ed. at 170. Defendant contends that his Sixth Amendment right to counsel was violated by the delay in the appointment of counsel and because he made incriminating statements over the jail phone before he was afforded the "guiding hand of counsel." We disagree.

Police initially detained defendant for detoxification in the late evening of 8 May 2003. The next morning, on 9 May 2003, defendant was charged with assault with a deadly weapon with intent to kill

inflicting serious injury and attempted murder, and he requested counsel after police advised of his *Miranda* rights. At his first appearance on those charges, on 12 May 2003, the court appointed Indigent Defense Services ("IDS") as counsel. Later in the day on 12 May 2003, defendant was charged with first-degree murder. Defendant made his first appearance on the murder charge on 13 May 2003, at which time the court again noted that counsel was to be appointed. Defendant met with appointed counsel on 14 May 2003. On 10 May 2003, defendant made incriminating statements on the jail phone, which were recorded and introduced by the State at trial. Defendant asserts that the State deliberately denied him the "guiding hand of counsel" during this time so that it could exploit a situation "likely to induce [defendant] to make incriminating statements without the assistance of counsel." *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115 (1980).

Defendant cites *Powell v. Alabama* in support of his argument that he was entitled to appointed counsel at an earlier time. 287 U.S. 45, 77 L. Ed. 158. However, *Powell* involved a defendant who did not have counsel at trial as the court at the arraignment had merely charged "all the members of the bar" to represent defendant. *Id.* at 69, 77 L. Ed. at 160-61. Defendant does not dispute that he received a timely first appearance or that at that appearance the court appointed IDS to represent him. The IDS attorney met with defendant two days after his first appearance on the initial charges and one day after he was charged with murder. These facts bear no meaningful resemblance to *Powell* and as defendant cites no other authority, we overrule this assignment of error.

**[4]** Defendant also argues that the police impermissibly elicited statements from him after he invoked his right to counsel. The government may not deliberately elicit incriminating statements from a defendant after he has invoked his Sixth Amendment right to counsel. *Maine v. Moulton*, 474 U.S. 159, 88 L. Ed. 2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115. In *United States v. Henry*, a defendant awaiting trial made incriminating statements to a fellow inmate, who was acting as a paid government informant and who testified against the defendant at trial. *Id.* The Court held that the informant's statements were inadmissible because the Government violated Henry's Sixth Amendment right to counsel "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel." *Id.* at 274, 65 L. Ed. 2d at 125. Similarly, in *Maine v. Moulton*, the defendant made incrimi-

STATE v. HOCUTT

[177 N.C. App. 341 (2006)]

nating post-indictment statements to a co-defendant who, unbeknownst to defendant, had made a deal with the State to testify against the defendant and was wearing a recorder during a meeting with defendant. 474 U.S. 159, 88 L. Ed. 2d 481. The Court held that the government violated the defendant's Sixth Amendment rights by violating its "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by counsel." *Id.* at 171, 88 L. Ed. at 493. The primary concern of this line of decisions is "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 91 L. Ed. 2d 364, 384 (1986). Thus,

> the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached . . . . [T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.* (internal quotation marks and citation omitted).

Here, defendant has made no showing that the State deliberately elicited incriminating statements from him. Our careful review of the record indicates that although Detective Gaddis told Barbara Langston some facts about the crime which she later discussed with defendant over the jail phone, Langston was not acting as an agent of, or informant for, the State. Indeed, defendant does not allege that Langston acted at the request of the State, and Detective Gaddis denied that he gave Langston information about the case in order to deliberately elicit incriminating statements from defendant. We overrule this assignment of error.

**[5]** Defendant also argues that the court violated his constitutional and statutory rights to have a reasonable bail set. U.S. Const., Amend VIII, XIV; N.C. Const., Art. I., 27; N.C. Gen. Stat. §§ 15A-511, 533 (2002). We disagree. Defendant concedes that the determination of what a "reasonable" bond is rests within the trial court's discretion. However, he argues that when the court set the bond as "no bond" and "zero", it failed to exercise its discretion. As defendant was charged with first-degree murder, a capital offense, the trial court had the discretion not to set bail. N.C. Gen. Stat. § 15A-533(c); *State v. Sparks*, 297 N.C. 314, 320, 255 S.E.2d 373, 378 (1979). Accordingly, we conclude that this assignment of error lacks merit.

STATE v. HOCUTT

[177 N.C. App. 341 (2006)]

Defendant next argues that the trial court committed constitutional error when it denied his motion to suppress evidence seized from his person. Defendant contends that his clothing and gunshot residue hand-wipings were seized incident to his unlawful and unconstitutional seizure and incarceration and thus should have been suppressed. Because we have concluded that defendant's initial seizure and incarceration were not unconstitutional, we overrule this assignment of error.

[6] Defendant also contends that the court erred when it permitted an SBI agent to testify about the results of DNA tests performed by a different agent who did not testify. Defendant argues that this violated his constitutional rights under the Confrontation Clause of the Sixth Amendment, as interpreted by the United States Supreme Court in *Crawford v. Washington*. 541 U.S. 36, 158 L. Ed. 2d 177 (2004). In *Crawford*, the Court held that for testimonial evidence to be admitted against a defendant, the Confrontation Clause requires witness unavailability and a prior opportunity for cross-examination by the defendant. *Id.* at 68, 158 L. Ed. 2d at 203. However, *Crawford* left it to the States to determine how to address non-testimonial hearsay. *Id.* This Court has previously held that one SBI agent's testimony about the results of analysis conducted by another agent is non-testimonial under *Crawford*, and thus does not violate the Confrontation Clause. *State v. Walker*, 170 N.C. App. 632, 635, 613 S.E.2d 330, 333, *disc. review denied*, 359 N.C. 856, 620 S.E.2d 196 (2005); *State v. Delaney*, 171 N.C. App. 141, 144, 613 S.E.2d 699, 701 (2005); *State v. Watts*, 172 N.C. App. 58 , 67-68 , 616 S.E.2d 290, 297 (2005). Accordingly, we overrule this assignment of error.

[7] In his next argument, defendant asserts that the trial court erred in failing to dismiss the charge of first-degree murder for insufficiency of the evidence. The State relied on two theories of first-degree murder: murder with specific intent formed after premeditation and deliberation, and murder by lying in wait. Defendant contends that there was insufficient evidence to support a conviction under either theory. We disagree.

In reviewing the trial court's ruling on a defendant's motion to dismiss, this Court evaluates the evidence presented at trial in the light most favorable to the State. *State v. Davis*, 130 N.C. App. 675, 679, 505 S.E.2d 138, 141 (1998). We consider whether the State presented "substantial evidence" in support of each element of the charged offense and of defendant's identity as the perpetrator of the offense. *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). "Substantial evi-

dence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin,* 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990). Ultimately, we must decide "whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *State v. Lee,* 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998).

In order to prove first-degree murder by premeditation, the State was required to show the unlawful killing of another with malice and a specific intent to kill, committed after premeditation and deliberation. *See* N.C. Gen. Stat. § 14-17 (2003); *State v. Cozart,* 131 N.C. App. 199, 202, 505 S.E.2d 906, 909 (1998), *disc. review denied,* 350 N.C. 311, 534 S.E.2d 600 (1999). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Conner,* 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* at 635, 440 S.E.2d at 836. "Since a specific intent to kill is a necessary constituent of the elements of premeditation and deliberation, proof of premeditation and deliberation is also proof of intent to kill." *State v. Lowery,* 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983). First-degree murder by lying in wait "refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim." *State v. Leroux,* 326 N.C. 368, 375, 390 S.E.2d 314, 320 (1990) (internal quotation marks omitted).

Defendant argues that the evidence only supports second-degree murder, that it shows no more than a "shooting of opportunity," and that only mere speculation supports theories of premeditation or lying in wait. However, the evidence tends to show that there was a history of violence and hostility between the parties. The evidence also shows that on the night of the shooting, the victim, Turner, saw defendant as he was leaving a convenience store. As Turner left, he "flipped [defendant] the bird" and shouted "f— you," at him. Defendant then yelled "f— you" at Turner. After defendant and his girlfriend, Langston, left the store, defendant twice told Langston that "he ought to shoot the motherf———." He then told her to stop the car and let him out, whereupon he got a beer and a "big gun" from the trunk. She left him on the side of the Branch Chapel Church Road with the gun in his hands at shortly after 6:00 p.m. She told Detective

Gaddis that at that time she thought defendant was going to shoot Turner. Turner was shot on Branch Chapel Church Road at around 6:15 or 6:30 p.m. A shotgun shell casing, a beer can with defendant's DNA on it, and a pair of sunglasses with defendant's fingerprint on them were found in a bush nearby. Also, as discussed, defendant stated that he shot Turner because Turner had shot him. The State's medical examiner testified that Turner died as a result of shotgun wounds that were fired from a distance of more than two, but less than four or five feet distance. We conclude that, viewed in the light most favorable to the State, there was sufficient evidence of premeditation and deliberation, or lying in wait, and the trial court properly denied the defendant's motion to dismiss.

**[8]** Defendant next argues that the trial court committed constitutional error when it denied his motions to dismiss and for a mistrial for discovery violations by the State. We disagree. Although N.C. Gen. Stat. § 15A-910 (2003) allows the trial court to impose sanctions for discovery violations, it is well-established that "the determination of whether to impose sanctions rests solely within the discretion of the trial court." *State v. Jones*, 151 N.C. App. 317, 325, 566 S.E.2d 112, 117 (2002), *disc. review denied*, 356 N.C. 687, 578 S.E.2d 320 (2003). "Therefore, the trial court's decision will only be reversed for an abuse of discretion . . . upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (internal quotation marks and citation omitted).

Here, on 4 May 2004, the court ordered the State to produce test results and other testing information, but the State did not do so until 20 August 2004, after trial had begun. "[I]t's apparent that the defendant may need some additional time to consider the information and the evidence that has been delivered to defendant . . . The Court is going to allow the defendant some additional time to review that evidence and to determine if experts are needed and, if so, to make contact with those experts." The court then suggested to defendant's trial counsel that he use the afternoon to determine the availability of experts. Counsel and the trial court then discussed the anticipated dates of the State's expert witnesses. Given the trial court's attention to the State's discovery violation, and its willingness to allow the defendant time to contact experts, we cannot conclude that the trial court abused its discretion. We overrule this assignment of error.

No error.

Judges BRYANT and CALABRIA concur.