STATE OF NORTH CAROLINA v. JOHN ANTHONY HOLCOMBE, AND DANNY RAY HOLCOMBE

No. COA09-860

(Filed 20 April 2010)

## 1. Assault— in secret—evidence not sufficient

The trial court erred by not dismissing a charge of malicious secret assault for insufficient evidence where the State did not present evidence that the victims were unaware of defendants'

purpose prior to the attack, that defendants intended to be furtive in their assault, or that the victims were surprised. In fact, the State's own evidence contradicted the secret manner element of the offense.

**2. Aiding and Abetting— evidence not sufficient—evidence of principal crime not sufficient**

There was insufficient evidence to support a conviction for aiding and abetting malicious secret assault where the State did not produce sufficient evidence of the principal crime.

Appeal by defendants from judgments entered 12 February 2009 by Judge J. Marlene.Hyatt in Haywood County Superior Court. Heard in the Court of Appeals 12 January 2010.

> *Attorney General Roy A. Cooper, III, by Assistant Attorney General Barry H. Bloch, for the State (JAH).*

> *Attorney General Roy A. Cooper, III, by Special Deputy Attorney General V. Lori Fuller, for the State (DRH).*

> *Hyler & Lopez, P.A., by George B. Hyler, Jr. and Robert J. Lopez, for defendants-appellants.*

JACKSON, Judge.

Danny Ray Holcombe ("Danny") appeals his 11 February 2009 convictions for malicious assault in secret, assault with a deadly weapon, injury to personal property, carrying a concealed weapon, and assault and battery. John Anthony Holcombe ("John") (collectively with Danny, "defendants") appeals his 11 February 2009 conviction of aiding and abetting malicious assault in secret. For the reasons stated below, we vacate both Danny's conviction for malicious assault in secret and John's conviction for aiding and abetting malicious assault in secret.

In July 2008 Michelle McElrath ("McElrath") knew that her uncle by marriage, Danny, was seeking oxycontin pills and that her friend Jamie Woody ("Woody") had access to oxycontin. She set up a meeting between them. On or about 8 July 2008, Woody, Brian Mull ("Mull"), and Jonathan Mintz ("Mintz") (collectively "accusers") drove in Mull's Mustang ("the Mustang") to Danny's home. Woody left his wallet at the home and Mintz stayed behind as well, so that Danny would know that Woody "wasn't going to rip him off." Mull and Woody then took Danny's $450.00 and drove to pick up the oxy-

contin. While in transit, Woody learned that the friend from whom he had planned to purchase the oxycontin no longer had it available. Mull and Woody returned to Danny's home, gave him his money back, and left.

Later that day, Woody, Mull, and Mintz decided to "tell Danny we can get some pills . . . [and] get more money out of him." According to Woody, "I didn't intend on getting him my pills. I intended on taking his money and going out of town to work." Woody called Danny, went with Mull and Mintz back to his house, and collected $660.00 from him. This time, Woody did not leave his wallet, and Mintz, as planned, pretended to have forgotten his cigarettes, left the home, and jumped into the Mustang as it "sped off." Danny called Woody numerous times over the next week, and according to Woody, made statements such as, "Oh, your money ain't going to help you now. You're mine, son[.]"

On 22 July 2008, McElrath called Woody and asked him to drive her to a relative's house in order for her to borrow money; she said she would give him $20.00 for gas. Mintz testified that he "didn't feel right when [McElrath] called" for a ride. Using the Mustang, Woody, Mull, and Mintz dropped McElrath off and drove to High Street Church ("the church") where she had told them to wait for her. Woody "knew something kind of sounded fishy" so he "told [Mull] to back [the Mustang] in. That way [he] could watch the street[.]" According to Woody, "there had been rumors—Danny threatening to get us. So when you're in Canton after you done ripped a man off in Canton, you've got to watch your back at all times."

When the accusers dropped McElrath off, she called Danny to tell him where to find them. After they received McElrath's phone call, both defendants and John's girlfriend traveled in Danny's SUV to the church. Danny also called another brother, Donald Holcombe ("Donald"), to go with them to the church in his truck.

After the accusers had been waiting in the church parking lot for five to ten minutes, an SUV and a truck pulled in and attempted to block the Mustang from the front and from behind. Woody "recalled that SUV that Danny drove, so [he] knew it was Danny." John exited the SUV with a baseball bat. Woody then "hollered that it was Danny" and Mull "pulled [the Mustang] back far enough to where [he] could clear the front vehicle and then took off." Danny sped after them in his SUV down High Street, so John jumped into the truck with Donald and they followed.

As the Mustang drove away, it was forced to stop for a gold truck that was backing into a driveway. When it stopped, Danny rammed his SUV into the Mustang. Once the accusers resumed driving, they began to turn right onto Reservoir Road when Danny again hit the Mustang with his SUV. The Mustang began to fishtail and ran into a tree. Danny's SUV then ran into the Mustang again. The Mustang's air bags deployed.

After the crash, Mull got out of the driver's side door, saw Danny "pushing his [car] door open with a pistol," and heard Danny say that he was going to shoot them. Mull was scared and ran down Reservoir Road. Woody also got out of the Mustang, saw Danny with a gun, and ran down Carson Street. Woody ran to a former neighbor's house and called 911. Mintz was in the backseat of the Mustang and hit his head on the ceiling during the collision. Both Mull and Woody were gone when Mintz recovered from the stun. Mintz exited the Mustang and saw Danny pointing a gun at him. Danny yelled at Mintz and hit him in the eye with either his left hand or the gun. Mintz felt blood running down his face, so he got up, ran down the road, and caught up with Mull.

John and Donald arrived in the truck and drove after Mull and Mintz. Police officers then arrived at the scene. Mull, Mintz, and Woody were taken to the hospital. Several witnesses corroborated the car chase, the wreck, and the subsequent fight between Danny and Mintz. One witness also testified that, following the wreck, John's girlfriend exited the SUV with two baseball bats.

On 29 September 2008, Danny was indicted on one count of malicious assault in secret, three counts of assault by pointing a gun, three counts of assault with a deadly weapon with intent to kill inflicting serious injury, one count of injury to personal property, one count of carrying a concealed weapon, and one count of assault and battery. On the same date, John was indicted on one count of felony aiding and abetting secret assault. On 11 February 2009, a jury convicted Danny of one count of malicious secret assault, one count of assault with a deadly weapon, one count of injury to personal property, one count of carrying a concealed weapon, and one count of assault and battery; he was found not guilty of the other charges. John was convicted of felony aiding and abetting the crime of secret assault. Defense counsel did not raise an objection to the verdicts when rendered or at sentencing. Defendants appeal.

**[1]** Defendants filed a joint brief with this Court. However, their first, fourth, and fifth arguments pertain only to Danny, and their second, third, sixth, and seventh arguments pertain only to John. We first address defendants' arguments that the trial court erred by denying Danny's motion to dismiss the charge of malicious secret assault based upon a lack of sufficient evidence. We agree.

Our Supreme Court previously has summarized the standards we use when evaluating a motion to dismiss:

> The rules governing motions to dismiss in criminal cases are well settled and familiar. When a defendant moves for dismissal, the trial judge must determine whether there is "substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the crime." The term "substantial evidence" is deceptive because, as interpreted by this Court in the context of a motion to dismiss, it is interchangeable with "more than a scintilla of evidence." Thus, the true test of whether to grant a motion to dismiss is whether the evidence, considered in the light most favorable to the State, is "existing and real, not just seeming or imaginary." If the evidence will permit a reasonable inference that the defendant is guilty of the crime charged, the trial judge should allow the case to go to the jury. This is true whether the evidence is direct, circumstantial or both.

*State v. Faison*, 330 N.C. 347, 358, 411 S.E.2d 143, 149 (1991) (internal citations omitted). Additionally, " 'defendant's evidence, unless favorable to the State, is not to be taken into consideration[.]' " *State v. Abshire*, 363 N.C. 322, 328, 677 S.E.2d 444, 449 (2009) (quoting *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971)).

The North Carolina General Statutes, section 14-31 defines malicious assault in a secret manner:

> If any person shall in a secret manner maliciously commit an assault and battery with any deadly weapon upon another by waylaying or otherwise, with intent to kill such other person, notwithstanding the person so assaulted may have been conscious of the presence of his adversary, he shall be punished as a Class E felon.

N.C. Gen. Stat. § 14-31 (2007). The crime of maliciously assaulting in a secret manner ("malicious secret assault") consists of five elements: (1) secret manner, (2) malice, (3) assault and battery, (4) deadly weapon, and (5) intent to kill. *See State v. Hill*, 287 N.C. 207,

214 S.E.2d 67 (1975) and *State v. Green*, 101 N.C. App. 317, 399 S.E.2d 376 (1991).

Here, defendants do not challenge the sufficiency of the State's evidence as to the elements of malice, assault and battery, and deadly weapon. Therefore, we confine our analysis to the elements of secret manner and intent to kill.

We previously have held that "[r]egarding defendant's 'secret manner,' the victim does not have to be aware of the defendant's presence, but it is necessary that the victim not know the defendant's purpose." *Green*, 101 N.C. App. at 321, 399 S.E.2d at 379 (citing *State v. Oxendine*, 187 N.C. 658, 122 S.E. 568 (1924)). We believe that the *Green* Court was unclear in its restatement of *Oxendine's* original rule that it "is not essential to a conviction for a secret assault . . . that the person assaulted should be unconscious of the presence of his adversary[.]" *State v. Oxendine*, 187 N.C. 658, 663, 122 S.E. 568, 571 (1924). The body of case law that addresses the secret manner element of malicious secret assault reinforces that, if the victim is unaware of the defendant's presence, then the assault is a secret one, because if one's presence is unknown, then his purpose to assault necessarily also is unknown. If a defendant's presence is known but the purpose underlying the assault is not, our courts have held that that also satisfies the secret manner element. Therefore, we believe that the *Green* Court simply intended to note that, regardless of whether the victim is aware of the defendant's presence, he cannot know of the defendant's purpose to assault him in order for the assault to be committed in a secret manner.

We previously have noted that "[i]n the context of an assault case, 'lying in wait' [or secret manner] is nothing more or less than taking the victim by surprise[.]" *State v. Puckett*, 66 N.C. App. 600, 604-05, 312 S.E.2d 207, 210 (1984). "Although concealment is not a necessary element . . ., it is clear from this Court's prior decisions that some sort of ambush and surprise of the victim are [sic] required." *State v. Lynch*, 327 N.C. 210, 218, 393 S.E.2d 811, 816 (1990). " 'Even a moment's deliberate pause before [assaulting] one unaware of the impending assault and consequently 'without opportunity to defend himself' satisfies the definition . . . .' " *Id.* (quoting *State v. Leroux*, 326 N.C. 368, 376, 390 S.E.2d 314, 320 (1990)). Important considerations for the secret manner element center on the suddenness of the attack, *see, e.g.*, *Lynch*, 327 N.C. at 217-18, 393 S.E.2d at 815-16, and the inability of the victim to defend himself, *see, e.g.*, *State v. Bridges*, 178 N.C. 733, 738, 101 S.E. 29, 32 (1919).

Our case law provides a number of examples of what constitutes taking a victim by surprise, thereby fulfilling the secret manner element of malicious secret assault: a defendant who poisoned her husband's coffee at breakfast, *State v. Alderman*, 182 N.C. 917, 110 S.E. 59 (1921); a defendant who shot a police officer in the dark as he rounded a corner, *Bridges, supra*; a defendant who struck the victim from behind with a large stick, *State v. Harris*, 120 N.C. 577, 26 S.E. 774 (1897); and most recently, a defendant who shot the victim from within a wooded area, *Green, supra*.

Cases that address murder by lying in wait also may be instructive as to malicious secret assault. *See State v. Joyner*, 329 N.C. 211, 217, 404 S.E.2d 653, 656-57 (1991) (noting that the crimes of malicious secret assault and murder by lying in wait include the same underlying actions but differ in that the former does not result in a death while the latter does). Examples of murder by lying in wait—in which the "lying in wait" element was challenged and the State's evidence found sufficient—include a defendant who intentionally remained out of the victim's sight and waited until the victim left a store before attacking her, *State v. Richardson*, 346 N.C. 520, 536-37, 488 S.E.2d 148, 158 (1997); a defendant who hid inside a house before shooting the victim, *State v. Aikens*, 342 N.C. 567, 574, 467 S.E.2d 99, 103-04 (1996); a defendant who concealed himself on a dark golf course and fired a gun at police officers, *State v. Leroux*, 326 N.C. 368, 376-77, 390 S.E.2d 314, 320-21 (1990); and a defendant who was concealed behind a bush and shot the victim, *State v. Hocutt*, 177 N.C. App. 341, 352, 628 S.E.2d 832, 840 (2006).

These cases are similar to each other in several respects. For most of the victims, their first awareness of potential danger occurred simultaneously with the assaults themselves. Also, most of the defendants were concealed and waiting for their victims prior to the victims' arrival at the scene. Finally, each defendant took some deliberate action to disguise either his presence or his purpose from the victim. All of these factors indicate that the victims were taken by surprise and were unable to defend themselves from the assaults.

In the instant case, the State has not presented any evidence that Woody, Mull, and Mintz were unaware of defendants' purpose prior to the attack nor that defendants intended to be furtive in their assault. The State's brief merely asserts that McElrath acted as an accomplice in luring the accusers to the church parking lot and that defendants drove into the parking lot where they "surprised and surrounded the victims' car[.]" However, the citations to the transcript that the State

**STATE v. HOLCOMBE**

[203 N.C. App. 530 (2010)]

provided for this statement include no testimony that Woody, Mull, or Mintz was surprised by defendants' arrival in the parking lot. The State's brief also lacks any argument that defendants attempted to be furtive in their approach of the Mustang and its occupants. Although the State is due the benefit of every reasonable inference, the State has presented no evidence or argument that this assault was committed in a secret manner.

In fact, the State's own evidence contradicts the secret manner element of the offense. Woody and Mintz clearly testified that "something kind of sounded fishy" and that they "didn't feel right" about the situation. When McElrath asked Woody to give her a ride, he responded, "Yeah. I'll take you as long as it's not a setup." Based upon earlier threats from Danny and what the accusers felt were dubious circumstances, Woody even "told [Mull] to back [the Mustang] in. That way [he] could watch the street[.]" Woody also acknowledged that "there had been rumors—Danny threatening to get us. So when you're in Canton after you done ripped a man off in Canton, you've got to watch your back at all times."

Furthermore, although McElrath testified that she called defendants in order for them to have the opportunity to take revenge, she never stated that defendants asked her to set this trap. Danny had called Woody often in the weeks prior to the assault, and he had threatened him. Defendants drove into the parking lot in broad daylight, and John jumped out of the SUV with a baseball bat. Defendants did not conceal themselves somewhere to wait, and they did not plan an attack to occur in the dark or from behind. Nothing about defendants' actions was secretive either as to their presence or as to their purpose to assault Woody, Mull, and Mintz.

Finally, the accusers here were inside a car when defendants arrived, and John got out of the SUV in order to pursue them with a baseball bat. Woody, Mull, and Mintz were aware of both the presence and the purpose of defendants in time to defend themselves by escaping and prior to any assault. Also, even if, contrary to their testimonies, the accusers were surprised when defendants arrived at the parking lot, by the time Danny rammed his SUV into the Mustang, they were well-aware that an assault could happen. The State has presented no evidence that Woody, Mull, or Mintz was surprised, that they had no opportunity to defend themselves, or that defendants took steps to make the assault secretive.

Our case law unequivocally requires that the victim be caught unaware in order for the secret manner element of malicious secret assault to be satisfied. *See Oxendine,* 187 N.C. at 663, 122 S.E. at 571 ("It is not essential to a conviction for a secret assault, under the statute as now written,[1] that the person assaulted should be unconscious of the presence of his adversary; but his purpose must not be known, for in that event the assault would not have been committed in a secret manner.") (citation omitted) and *Lynch,* 327 N.C. at 218, 393 S.E.2d at 816 ("[I]t is clear from this Court's prior decisions that some sort of ambush and surprise of the victim are [sic] required."). Although the State attempts to analogize the .current facts with those of *Hill, supra* (defendant asked another inmate to lure a prison guard to a mop room, where defendant was waiting to beat the guard with a mop handle), our research has disclosed no case addressing malicious secret assault that is in any way similar to a car chase in broad daylight following weeks of threats and accusers' own apprehension that an assault from defendant was possible.

The State also suggests in its brief that during the car chase, Woody, Mull, and Mintz "had no way of knowing that the defendant was actually going to ram their car with his vehicle" and that that fact would support the secret manner element of the charged offense. However, when a person is confronted with a deadly weapon, especially in the midst of a hostile confrontation with an antagonistic party, the opposing party does not act secretively when he subsequently uses that deadly weapon to perpetrate a battery. Even affording the State the benefit of every reasonable inference, the evidence simply is not sufficient to support the secret manner element of malicious secret assault. Therefore, we must hold that the trial court erred in denying Danny's motion to dismiss because the State did not produce substantial evidence as to the element of secret manner. We vacate his conviction for malicious secret assault.

Because we have vacated Danny's conviction for malicious secret assault based upon a lack of evidence as to secret manner, we do not address his argument as to the intent to kill element.

**[2]** Defendants' final argument is that insufficient evidence was before the trial court to support John's conviction for aiding and abetting malicious secret assault. We agree.

---

1. The operative language of the current statute that prohibits malicious secret assault, North Carolina General Statutes, section 14-31, matches verbatim with the 1924 statute as set forth in *Oxendine,* 187 N.C. at 663, 122 S.E. at 570-71.

**IN RE T.D.W.**

[203 N.C. App. 539 (2010)]

The standard for reviewing a motion to dismiss based upon insufficiency of the evidence is discussed *supra. See Faison.* Although it is not defined by our statutes, our Supreme Court has upheld three elements of the crime of aiding and abetting: "(1) that the [principal] crime was committed by another; (2) that the defendant knowingly advised, instigated, encouraged, procured, or aided the other person; and (3) that the defendant's actions or statements caused or contributed to the commission of the [principal] crime by the other person." *State v. Bond,* 345 N.C. 1, 24, 478 S.E.2d 163, 175 (1996) (citing *State v. Francis,* 341 N.C. 156, 161, 459 S.E.2d 269, 272 (1995)).

Here, the State did not provide sufficient evidence of the first element of aiding and abetting—that the principal crime was committed by another—because, as discussed previously, there existed insufficient evidence that Danny committed the crime of malicious secret assault. Accordingly, the trial court erred by denying John's motion to dismiss his aiding and abetting charge, and we vacate that conviction.

Because we vacate Danny's conviction for malicious secret assault and John's conviction for aiding and abetting malicious secret assault based upon a lack of sufficient evidence as to each element of the charged crimes, we do not address defendants' remaining arguments.[2]

Vacated.

Judges McGEE and HUNTER, Jr. concur.

---

2. None of defendants' arguments challenge Danny's remaining convictions for assault with a deadly weapon, injury to personal property, carrying a concealed weapon, and assault and battery. We do not disturb those convictions by vacating his conviction for malicious secret assault.